**HOLT OIL & GAS CORPORATION and Faywin Investments, Pty. Ltd., Plaintiffs-Counter Defendants-Appellees,**

v.

**Ralph L. HARVEY, Defendant-Counter Plaintiff-Appellant.**

No. 85–1491.

United States Court of Appeals, Fifth Circuit.

Oct. 8, 1986.

Rehearing Denied Nov. 19, 1986.

Roger E. Beecham, Stigall & Maxfield, Benjamin Raye Collier, Mark D. Foster, Dallas, Tex., Fellers, Snider, Blankenship, Bailey & Tippens, Harry H. Selph, II, Oklahoma City, Okl., for defendant-counter plaintiff-appellant.

C. Steven Matlock, Jr., Jackson, Walker, Winstead, Cantwell & Miller, Dallas, Tex., for plaintiffs-counter defendants-appellees.

Before WISDOM, JOHNSON, and HIGGINBOTHAM, Circuit Judges.

JOHNSON, Circuit Judge:

Ralph Harvey appeals from the district court's judgment in favor of Holt Oil & Gas Company ("Holt") in this diversity action. Finding Harvey's contentions unpersuasive, we affirm the judgment of the district court.

## I.

This lawsuit arises out of an ill-fated oil and gas drilling venture in northwestern Oklahoma. The plaintiff, Holt Oil & Gas Company,[1] is a Texas corporation with its principal place of business in Dallas. The defendant, Ralph Harvey, is an Oklahoma resident who is in the business of investing in oil and gas drilling ventures.

In 1981, Holt filed with the Oklahoma Corporation Commission notice of its intent to drill on certain acreage in Beaver County, Oklahoma. After filing notice, Holt discovered that Harvey owned a one-eighth leasehold interest in the proposed drill site. Holt offered Harvey an opportunity to participate in drilling the well which Harvey accepted thereby acquiring a working interest in the well. After some negotiation, Holt and Harvey executed a Joint Operating Agreement (JOA), the terms of which were to govern the drilling project.

Under the terms of the JOA, Harvey agreed to pay a pro rata share of the costs incurred in drilling an initial well in the Marmaton geological formation. The JOA provided that this well would be drilled "to a true vertical depth of 6,900 feet; or to a depth sufficient to test the Marmaton Lime, ..." This initial well was designated the "Campbell 1" well. The JOA further provided that if any party sought to drill a subsequent well, or to

> rework, deepen or plug back a dry hole drilled at the joint expense of all parties or a well jointly owned by all the parties and not then producing in paying quantities, the party desiring to drill, rework, deepen or plug back such a well shall give the other parties written notice of the proposed operation, specifying the work to be performed, the location, proposed depth, objective formation and the estimated cost of the operation. The parties receiving such a notice shall have fifteen (15) days after receipt of the notice within which to notify the parties wishing to do the work whether they

elect to participate in the cost of the proposed operation.

The Campbell 1 drilling effort encountered numerous difficulties and was ultimately unsuccessful. In December of 1981, after drilling to a depth of approximately 6,700 feet, Holt sent a new drilling prognosis to Harvey which called for sidetracking the Campbell 1 well. Under this prognosis, Holt would use the first 1640 feet of the Campbell 1 well and then directionally drill from that depth to a depth sufficient to evaluate the Marmaton formation. The sidetracking operation was designated "Campbell 1-A."

Harvey, upset by the problem plagued Campbell 1 drilling effort, advised Holt on December 21, 1981, that he would not pay any expenses incurred due to Holt's imprudence and negligence. Harvey also refused to pay any expenses associated with the Campbell 1-A sidetrack operation. The sidetrack operation nevertheless continued until March of 1982 when Holt determined that the Campbell 1-A well was a dry hole. Holt then decided to recomplete the Campbell 1-A well in the Cleveland geological formation. Harvey participated in the recompletion operation which was also eventually unsuccessful. After the recompletion effort failed, Holt plugged the well.

Holt initiated the instant diversity action in the United States District Court for the Northern District of Texas seeking to recover Harvey's unpaid share of the operating expenses. According to Holt, Harvey had breached the JOA by refusing to pay any costs associated with the Campbell 1-A sidetrack operation. Holt also alleged that Harvey had refused to pay some of the costs associated with either the Campbell 1 operation or the Cleveland recompletion operation.

Harvey moved to dismiss the action pursuant to Fed.R.Civ.P. 12(b)(2) asserting that the court lacked personal jurisdiction. In a written order issued on July 29, 1983, the district court denied Harvey's motion to dismiss. Harvey then filed an answer and

---

1. Holt has assigned its interest in this lawsuit to Faywin Investments Pty., Ltd. In this opinion, our references to Holt will include Holt and/or Faywin Investments.

counter-claim asserting, *inter alia,* (1) that the Campbell 1-A sidetrack operation was a "subsequent or other operation" under the terms of the JOA for which Harvey was not liable absent prior approval, and (2) that Holt had breached the JOA by failing to perform drilling operations in a reasonable and prudent manner. Following trial, the jury, in response to a number of special interrogatories, returned a verdict in favor of Holt. The district court denied Harvey's motion for a j.n.o.v. and Harvey filed timely notice of appeal. On appeal, Harvey raises a variety of challenges to the judgment of the district court.

## II.

As an initial matter, Harvey contends that the district court erred in failing to dismiss the case for want of personal jurisdiction. The district court properly exercised personal jurisdiction only if Harvey (1) was amenable to service of process under the Texas long-arm statute; and (2) the exercise of jurisdiction under Texas law was consistent with due process. *See Colwell Realty Investments v. Triple T Inns,* 785 F.2d 1330, 1333 (5th Cir.1986); *Stuart v. Spademan,* 772 F.2d 1185, 1189 (5th Cir.1985). Because the Texas long-arm statute has been interpreted to extend to the limits of due process, *see Hall v. Helicopteros Nacionales de Colombia, S.A.,* 638 S.W.2d 870, 872 (Tex.1982), *rev'd on other grounds,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984); *Colwell Realty,* 785 F.2d at 1333; *Stuart,* 772 F.2d at 1189, our inquiry in the instant case focuses solely on whether the district court's exercise of jurisdiction over Harvey comports with the constitutional requirement of due process.

In order for an exercise of personal jurisdiction to be consistent with due process, the nonresident defendant must have some minimum contact with the forum which results from an affirmative act on the part of the nonresident. *International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). In evaluating a nonresident's contacts with the forum, we must determine whether the nonresident has purposefully availed himself of the privilege of conducting activities within the forum state, thus invoking the benefits and protection of its laws. The defendant's conduct and connection with the forum state must be such that he should reasonably anticipate being haled into court in the forum state. *See Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958)).

 When a court exercises personal jurisdiction over a defendant based on contacts with the forum related to the particular controversy, the court is exercising "specific jurisdiction." *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 1872, 80 L.Ed.2d 404 (1984) (citing von Mehren & Trautman, *Jurisdiction to Adjudicate: A Suggested Analysis,* 79 Harv. L. Rev. 1138, 1144–64 (1966)). To exercise specific jurisdiction, the court must examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice. *Shaffer v. Heitner,* 433 U.S. 186, 204, 97 S.Ct. 2569, 2579, 53 L.Ed.2d 683 (1977). Even where specific jurisdiction is lacking, however, a court may nevertheless exercise "general jurisdiction" based on a defendant's contacts with the forum unrelated to the controversy. *Helicopteros Nacionales,* 104 S.Ct. at 1872. To exercise general jurisdiction, the court must determine whether "the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction." *Stuart,* 772 F.2d at 1191 (citing *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 104 S.Ct. 1473, 1480–81, 79 L.Ed.2d 790 (1984); *Perkins v. Benguet Consolidated Mining Co.,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485 (1952)).

Holt relies on both specific and general jurisdiction to support the district court's exercise of personal jurisdiction over Harvey. We proceed to first examine whether an exercise of specific jurisdiction was permissible. Harvey's only contacts with Tex-

as relating to the instant controversy were as follows: (1) Harvey entered into a contract with Holt, a Texas corporation; (2) Harvey sent a final revised joint operating agreement from Oklahoma to Texas; (3) Harvey sent three checks from Oklahoma to Texas in partial performance of its contractual obligations; and (4) Harvey engaged in extensive telephonic and written communication with Holt.

■ We conclude that these limited contacts were insufficient to support an exercise of specific jurisdiction. On several occasions this Court has observed that merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction. *See, e.g., Colwell Realty,* 785 F.2d at 1334; *Stuart,* 772 F.2d at 1192–93; *see also Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985). Although the contractual relationship between Holt and Harvey may have been cemented in Texas, the significance of this fact is diminished by the contract provision specifying that Oklahoma law would govern the agreement. *See Hydrokinetics, Inc. v. Alaska Mechanical, Inc.,* 700 F.2d 1026, 1029 (5th Cir.1983); *see also Burger King,* 105 S.Ct. at 2187 (discussing relevance of choice of law provision to minimum contacts analysis). Our conclusion is further bolstered by the fact that performance of the contract was centered in Oklahoma rather than Texas. *See id; Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir.1985). Given that the material performance occurred in Oklahoma, the fact that Harvey mailed payments to Texas does not weigh heavily in our determination. *See Patterson,* 764 F.2d at 1147 (all material performance occurred in Mexico despite the wiring of payments to Texas); *C & H Transportation Co. v. Jensen & Reynolds Construction Co.,* 719 F.2d 1267, 1270 (5th Cir.1983), *cert. denied,* 466 U.S. 945, 104 S.Ct. 1930, 80 L.Ed.2d 475 (1984) (fact that payment mailed to Texas is hardly significant in terms of purposeful availment); *Hydrokinetics,* 700 F.2d at 1029 (nor do we weigh heavily the mailing of payment checks into the forum).[2] Finally, the exchange of communications between Texas and Oklahoma in the course of developing and carrying out the contract was in itself also insufficient to constitute purposeful availment of the benefits and protections of Texas law. These communications to Texas rested on nothing but "the mere fortuity that [Holt] happens to be a resident of the forum." *Patterson,* 764 F.2d at 1147 (numerous telephone calls from defendant to forum during course of performance insufficient to support specific jurisdiction). *See also Stuart,* 772 F.2d at 1193; *Benjamin v. Western Boat Building Corp.,* 472 F.2d 723, 729 (5th Cir.), *cert. denied,* 414 U.S. 830, 94 S.Ct. 60, 38 L.Ed.2d 64 (1973).

Having concluded that insufficient contacts existed between Texas, Harvey, and the instant controversy to support an exercise of specific jurisdiction, we proceed to consider whether an exercise of general jurisdiction was proper.[3] To do so requires us to explore the nature of Harvey's contacts with Texas to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process. *See Helicopteros Nacionales,* 104 S.Ct. at 1873. Although the issue is close, we conclude that they do.

---

**2.** *Compare D.J. Investments v. Metzeler Motorcycle Tire,* 754 F.2d 542, 548–49 (5th Cir.1985) (necessary part of contract performance involved mailing distributorship packet to forum); *Mississippi Interstate Express, Inc. v. Transpo, Inc.,* 681 F.2d 1003, 1010 (5th Cir.1982) (Mississippi forum clearly the hub of parties' activities); *Product Promotions, Inc. v. Cousteau,* 495 F.2d 483, 496 (5th Cir.1974) (an integral, essential portion of performance, delivery of the results in satisfactory form, had to take place in forum).

**3.** Our conclusion that "specific" jurisdiction was lacking means only that due process requirements are not satisfied solely by Harvey's contacts with Texas relating to the instant controversy. A finding of no specific jurisdiction in no way precludes us from turning to examine the totality of Harvey's contacts, including all contacts related and unrelated to the present controversy, to determine if "minimum contacts" exist.

Harvey's general contacts with Texas include the following: (1) Harvey attended college and was formerly employed in Texas; (2) Harvey owns real estate in Texas, specifically a condominium in Houston; (3) Harvey has travelled to Texas on numerous occasions to visit his children; (4) Harvey frequently visits Texas for recreation; and (5) Harvey has transacted a great deal of business in Texas. In addition to his transaction with Holt, Harvey has had extensive business dealings with Permian Records of Dallas, Texas. Harvey has been a director of Permian Records and has attended director's meetings in Dallas. Harvey has also invested $250,000.00 in Permian Records. Finally, Harvey is the sole shareholder of Marlin Oil Company. Marlin Oil has drilled several wells in Texas and been involved in litigation in Texas. Harvey has travelled to Texas on several occasions in connection with the activities of Marlin Oil.

■ None of Harvey's various contacts with Texas, alone, would support an exercise of general jurisdiction. For example, Harvey's frequent journeys into Texas for personal and recreational purposes would not by themselves constitute the level of contact which must exist for general jurisdiction to lie.[4] *See generally Laxalt v. McClatchy,* 622 F.Supp. 737, 745 (D.Nev. 1985); *cf. Helicopteros Nacionales,* 104 S.Ct. at 1874 (purchasing trips into the forum insufficient to support assertion of general jurisdiction). Similarly, Harvey's ownership of realty in the forum unrelated to this litigation would not alone support an exercise of general jurisdiction. *See Shaf-*

*fer v. Heitner,* 433 U.S. 186, 208–10, 97 S.Ct. 2549, 2581–82, 53 L.Ed.2d 683 (1977). Nor would Harvey's status as an investor and former director of a Texas corporation alone be sufficient. *See id.* at 210, 97 S.Ct. at 2585–86.

■ Determining the existence of personal jurisdiction does not, however, involve an examination of each of Harvey's contacts with Texas viewed in isolation from one another. Rather we are required to examine Harvey's contacts *in toto* to determine whether they constitute the kind of continuous and systematic contacts required to satisfy due process. The record reveals that Harvey has maintained constant and extensive personal and business connections with Texas throughout his adult life. These contacts differ both qualitatively and quantitatively from the sort of "random," "fortuitous," or "attenuated" contacts which will not support an exercise of *in personam* jurisdiction. Moreover, we note that the instant controversy arises out of one of Harvey's business contacts with Texas. While that contact was not sufficient to support an exercise of specific jurisdiction, the fact that some connection exists between Harvey, the forum, and the controversy involved in the instant case is nevertheless relevant to our determination.[5] Based on the foregoing analysis, we conclude that Harvey had sufficient minimum contacts with Texas to support an exercise of *in personam* jurisdiction.

We also conclude that maintenance of this action against Harvey in Texas will not offend traditional notions of fair play and

4. This Court has, however, recently reaffirmed the continuing existence of transient jurisdiction in certain cases in which the defendant is served while physically present within the forum. *See Amusement Equipment, Inc. v. Mordelt,* 779 F.2d 264, 271 (5th Cir.1985).

5. Minimum contacts analysis is designed to protect an individual's liberty interest in not being haled into a distant or inconvenient forum. *See Insurance Corp. of Ireland v. Compagnie des Bauxites de Guinee,* 456 U.S. 694, 702–03, 102 S.Ct. 2099, 2104–05, 72 L.Ed.2d 492 (1982). In *Insurance Corp. of Ireland,* the Court observed that:

The personal jurisdiction requirement recognizes and protects an individual liberty interest. It represents a restriction on judicial power not as a matter of sovereignty, but as a matter of individual liberty.

This analysis requires a fact-intensive fairness inquiry for determining whether minimum contacts exist. *See also Madison Consulting Group v. State of South Carolina,* 752 F.2d 1193, 1198–99 (7th Cir.1985). While the distinction between "general" and "specific" jurisdiction provides an useful analytic device, the use of these categories does not alter the fundamental focus of the minimum contacts inquiry.

substantial justice. The fact that the injured party, Holt, is a resident of Texas provides Texas with a significant interest in providing a forum for this action. *See Thompson v. Chrysler Motors Corp.*, 755 F.2d 1162, 1173 (5th Cir.1985). Moreover, Harvey was not unreasonably inconvenienced by being required to defend the action in Texas. We note in this regard that Harvey was in Texas during the week this case was tried to participate in a golf tournament. In these circumstances, the district court properly exercised *in personam* jurisdiction.

### III.

Having concluded that the district court properly exercised personal jurisdiction, we proceed to consider Harvey's remaining claims. Harvey first asserts that the district court erred in refusing to find as a matter of law that the Campbell 1–A sidetrack was either a "subsequent" or "other" operation under the terms of the JOA. Instead, the district court submitted Question No. 2 to the jury which asked: "Do you find that the Campbell sidetrack was a continuation of the original Campbell 1 well as distinct from subsequent or other operations as defined in the Operating Agreement?" The jury concluded that it was and, consequently, that Harvey was liable for a pro rata share of expenses incurred during the Campbell 1–A operation.[6]

Harvey is clearly correct in stating that the interpretation of an unambiguous contract is a matter of law to be decided by the court. *See, e.g., Southern Natural Gas Co. v. Pursue Energy*, 781 F.2d 1079, 1081 (5th Cir.1986). On the other hand, a trial court may conclude that a contract is ambiguous and thus allow the jury to resolve the ambiguity by determining the underlying intent of the parties as a matter of fact.

*See id; Pletz v. Christian Herald Ass'n.*, 486 F.2d 94, 96 (5th Cir.1973); *Walker v. Telex Corp.*, 583 P.2d 482, 485 (Okla.1978). Whether a particular contract is ambiguous is a question of law. *Deauville Corp. v. Federated Dept. Stores, Inc.*, 756 F.2d 1183, 1193 (5th Cir.1985).

■ Our close examination of the contract provisions at issue in the instant case reveals that the Campbell 1–A sidetrack was not clearly and unambiguously a subsequent rather than initial operation under the terms of the JOA. In discussing the "initial well," the JOA states that:

> Operator shall commence the drilling of a well for oil and gas at the following location … and shall thereafter continue the drilling of the well with due diligence to a true vertical depth of 6,900 feet; or to a depth sufficient to test the Marmaton Lime, …

The JOA defines subsequent operations to include "any well on the Contract Area other than [the initial well]" or any operation intended to "rework, deepen or plug back a dry hole [or a well] not then producing in paying quantities…." The provision defining subsequent operations does not mention sidetrack operations. A sidetrack could be considered a well "other than the initial well." On the other hand, the provision for an initial well indicates an intent to drill as necessary to test the Marmaton formation. The Campbell 1 operation resulted in an incomplete test of the Marmaton formation because the hole was lost. The sidetrack operation could be considered merely a continuation of the initial test effort. Much of the testimony at trial was devoted to resolving this ambiguity.[7]

■ Similarly, the sidetrack operation was not clearly and unambiguously an "other" operation under the JOA. Article

---

**6.** The JOA required prior approval by Harvey before he could be held liable for expenses incurred during the course of subsequent or other operations. Thus, the finding that the Campbell 1–A sidetrack was not a subsequent or other operation was important to the jury's verdict since there was no prior approval by Harvey of the sidetrack.

**7.** The provision defining subsequent operations also includes any operation intended to rework a dry hole or a well not producing in paying quantities. The provision does not, however, address an operation like that in the instant case which was intended to rework a lost hole as part of the initial test effort.

VII of the JOA dealing with expenditures for other operations states that:

> Operator shall not undertake any single project reasonably estimated to require an expenditure in excess of $10,000, *except in connection with a well*, the drilling, reworking, deepening, completing, recompleting or plugging back of which has been *previously authorized* by or pursuant to this agreement...." (emphasis added).

The application of this provision to the Campbell 1–A sidetrack presents the same ambiguity as the "subsequent operations" provision. If the sidetrack was a continuation of the initial well, then Article VII(D) might well be inapplicable. Article VII(D) expressly excepts from its coverage the drilling of a previously authorized well. We note in this regard that the emphasis throughout Article VII(D) appears to be on expenses incurred during the course of *subsequent operations.* If, in contrast, the sidetrack was a second well, then Article VII(D) would apply.

Much of Harvey's brief is devoted to detailing extrinsic evidence supporting Harvey's interpretation of the JOA. We conclude, however, that under the *Boeing v. Shipman,* 411 F.2d 365, 374 (5th Cir.1969) (en banc), standard, more than sufficient evidence exists in the record to support the jury's finding that the sidetrack was not a subsequent or other operation. In particular, we note that several witnesses testified that the Campbell 1–A sidetrack was a continuation of the original well rather than a subsequent or other operation. *See* Record Vol. VIII at 387, 471, 524–27; Record Vol. X at 70.[8]

### IV.

Holt claimed the same damages on the same facts under both its breach of contract and quantum meruit theories of recovery. After finding Harvey liable to Holt, the jury awarded damages of $207,-136.64 for breach of contract but awarded nothing for quantum meruit. On appeal, Harvey contends that the jury's findings on damages are hopelessly inconsistent entitling him to a new trial.[9] We disagree.

While inconsistent jury responses to special interrogatories would require remanding the case for a new trial, answers are inconsistent only if irreconcilable. *Willard v. The John Hayward,* 577 F.2d 1009, 1011 (5th Cir.1978). We have no difficulty reconciling the jury's verdict in the instant case. The jury might well have concluded that Holt would unjustifiably receive a double recovery if damages were awarded under both theories of recovery.

### V.

Harvey next contends that he is entitled to a new trial because of certain prejudicial remarks made by the district judge during trial. To support this assertion, Harvey cites the following statement by the trial judge:

> Mr. Harvey, I don't know how to say this any more clearly than I had attempted to on several previous occasions. I think I am going to have to give you some incentive to obey my directive. So next time I sustain an objection to a non-responsive answer, it's going to cost you some money. Have I made that clear? The question is what your criticism was. We didn't need a dissertation on how failure to keep a rig or pump or hole clean can cause problems in drilling generally. We

---

**8.** We are unable to locate any indication in the record that Harvey raised his "divisible contract" claim before the district court. Even if he did, however, that claim appears to be merely a variation of his "other operation" argument already rejected by this Court.

**9.** Harvey has not waived the issue by failing to object at the time the jury returned its verdict. If answers to jury interrogatories are in irreconcilable conflict, then the trial judge lacks authority to enter judgment based upon those answers. Failure to contemporaneously object does not waive the right to assert the alleged irreconcilable conflict in a motion for a new trial. *See Brunner v. Maritime Overseas Corp.,* 779 F.2d 296 (5th Cir.1986). Nevertheless, the better practice is to object when the jury returns its verdict so that the trial judge can evaluate whether to send the case back to the jury at that point for reconsideration.

want to try this lawsuit, this dispute, what you know about it, not tell us all your knowledge as an expert geologist, or whatever you are, as far as Beaver County is concerned.

Record Vol. VII at 173. We conclude that this remark does not entitle Harvey to a new trial.

A federal trial judge is far from a figurehead or passive arbitrator. The judge has an obligation to conduct an orderly trial. In carrying out this responsibility, the trial judge is empowered to keep the case moving within the bounds of reason. *Dartez v. Fibreboard Corp.*, 765 F.2d 456, 471 (5th Cir.1985). A witness' continued failure to make responsive answers to questions may require a judicial reprimand of the witness. *Cf. Miley v. Delta Marine Drilling Co.*, 473 F.2d 856, 857 (5th Cir.), *cert. denied*, 414 U.S. 871, 94 S.Ct. 93, 38 L.Ed.2d 89 (1973).

■ Harvey did not object to the trial judge's remark at trial. Consequently, our review is limited to review for plain error. *Dixon v. International Harvester Co.*, 754 F.2d 573, 585 (5th Cir.1985). The trial judge's reprimand of Harvey followed numerous instances in which the trial judge had sustained objections to nonresponsive answers by Harvey. *See* Record Vol. VI at 30, 38, 39, 40, 61, 64, 72, 73, 102; Record Vol. VII at 131, 149, 164, 166, 170, 172. On four prior occasions the court had specifically requested that Harvey answer questions as directly and precisely as possible. Record Vol. VI at 40, 61, 73; Record Vol. VII at 166. It was only after these requests failed that the district court reprimanded Harvey. Thus, the district court's remarks were made in furtherance of the court's responsibility to "keep the trial moving." The remarks clearly did not rise to the level of plain error.

## VI.

Holt alleged at trial that Harvey had breached the JOA by failing to pay his proportionate share of the cost of drilling, completing, and operating the Campbell well. Harvey asserts on appeal that the district court erred in not submitting an interrogatory to the jury expressly inquiring into whether Harvey breached the JOA. We conclude, however, that Harvey's challenge to the form of special interrogatories is without merit.

■ A trial court has wide discretion in formulating special interrogatories to the jury. *E.g., Armco Indus. Credit Co. v. SLT Warehouse Co.*, 782 F.2d 475, 483 (5th Cir.1986); *Dobbs v. Gulf Oil Co.*, 759 F.2d 1213, 1215 n. 3 (5th Cir.1985); *Litman v. Massachusetts Mutual Life Ins. Co.*, 739 F.2d 1549, 1560 (11th Cir.1984); C. Wright & A. Miller, *Federal Practice and Procedure* § 2506 (1971 & 1986 Supp.). The trial court may, for example, properly divide a single ultimate fact issue into separate components with separate factual questions submitted regarding the various components in dispute. *See Gulf Coast Fans v. Midwest Electronics Importers*, 740 F.2d 1499, 1509–10 (11th Cir.1984).

■ Here, the jury found in response to Question No. 2 that the Campbell 1–A sidetrack was a continuation of the original Campbell 1 well and not a "subsequent operation" or "other operation" under the JOA. In response to Question No. 3, the jury found that Harvey consented to completing the Campbell 1–A, recompleting the Cleveland formation, and operating the Campbell 1–A. Finally, in response to Question No. 4, the jury found that Harvey failed to pay his proportionate share of the costs associated with drilling the Campbell 1 and 1–A, recompleting the Cleveland formation, and operating the Campbell 1 and 1–A. Thus, the jury found in favor of Holt on all disputed factual issues underlying Holt's breach of contract claim. The jury's responses to Questions 2, 3 and 4, read together, required the jury to determine the ultimate factual issue, .e., whether Harvey breached the JOA. An additional interrogatory expressly asking whether Harvey breached the JOA was unnecessary.

## VII.

Harvey's counterclaim alleged that Holt had breached the JOA by failing to conduct

operations in a good and workmanlike manner and that this failure constituted gross negligence. Harvey further alleged that Holt's conduct violated an implicit covenant to conduct operations in a prudent manner. According to Harvey, Holt's conduct not only precluded Holt from obtaining a money judgment on its breach of contract claim, but entitled Harvey to recover a judgment from Holt. The jury disagreed. In response to special interrogatories, the jury found that Holt performed its duties as operator of the Campbell well in a reasonable and prudent manner. The jury also refused to find gross negligence on the part of Holt.

■ Harvey's final contention on appeal is that these jury findings are contrary to the great weight of the evidence and, consequently, that the district court erred in refusing to grant Harvey's motion for a j.n.o.v.[10] Our standard of review on this issue is limited. A party is entitled to a j.n.o.v. only "[i]f the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict...." *Boeing v. Shipman*, 411 F.2d 365, 374 (5th Cir.1969) (en banc). In evaluating the evidence, the *Boeing* standard requires this Court to "consider all the evidence and in the light and with all reasonable inferences most favorable to the nonmover." *Thornton v. Gulf Fleet Marine Corp., Inc.*, 752 F.2d 1074, 1076–77 (5th Cir.1985).

■ Examining all the evidence in the light most favorable to Holt, we find ample evidence to support the jury's finding that Holt performed its duties as operator in a reasonable and prudent manner. Holt's former drilling engineer, Bryan Bellew, testified that in his opinion Holt had not in any respect been negligent or imprudent in connection with the Campbell well. Record Vol. VIII at 390–93. Two other petroleum engineers also testified that Holt had not been imprudent, negligent, or grossly negli-

gent in connection with the Campbell well. Record Vol. VIII at 461–77, 534–40. This testimony, although far from undisputed, was sufficient to support the jury's findings.

### VIII.

Having rejected all of Harvey's contentions raised on appeal, we affirm the judgment of the district court.

AFFIRMED.

---

10. At the close of trial, Harvey moved for a directed verdict, thus preserving his challenge to the sufficiency of the evidence. *See Scheib v.*

*Williams-McWilliams Co., Inc.*, 628 F.2d 509, 512 (5th Cir.1980).