**ST. MARTIN & MAHONEY, A.P.L.C.**

v.

**DIVERSIFIED AIRCRAFT HOLDINGS, LTD., et al.**

**Civil Action No. 95–2574.**

United States District Court, E.D. Louisiana.

March 29, 1996.

---

Tony Bryson Jobe, Law Offices of Tony B. Jobe, P.C., New Orleans, LA, for plaintiff.

Pauline Hardin, Nan Roberts Eitel, Jones, Walker, Waechter, Poitevent, Carrere & Denegre, New Orleans, LA, Paul Corcoran, Gilbert and Davis, New York City, for Diversified Aircraft Holdings, Ltd., Executive

Airway Ltd., East Coast Aviation Services, Ltd.

George C. Freeman, III, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, LA, for Atlantic Aviation Corp.

## ORDER AND REASONS

FALLON, District Judge.

Before the Court is a motion to dismiss for lack of personal jurisdiction, or alternatively, to transfer venue, filed by defendants Diversified Aircraft Holdings, Ltd. ("DAH"), Executive Airways, Ltd. ("Executive"), and East Coast Aviation Services, Ltd. ("East Coast"). For the reasons that follow, the motion is GRANTED.

**BACKGROUND:** This is a declaratory judgment action arising out of the sale of a Westwind–I Turbo Jet Aircraft from plaintiff, St. Martin & Mahoney, a Louisiana professional law corporation, to defendant DAH. Each of the movants is a New York corporation. Shortly after completion of the sale, DAH was notified by the Federal Aviation Administration ("FAA") that certain navigational equipment on the aircraft had not been certified in accordance with FAA regulations and that certain necessary forms had not been filed. As a result of these derelictions, the FAA grounded the aircraft. After demanding, unsuccessfully, that plaintiff produce the required certificates, DAH proceeded to obtain them and demanded reimbursement from plaintiff. When efforts to resolve this dispute amicably disintegrated, DAH informed plaintiff that it intended to file suit in New York for breach of contract. Plaintiff brought this action before the New York suit was filed.

When this motion to dismiss was filed, plaintiff argued that it should not be forced to proceed on affidavits alone but, rather, should be permitted to conduct discovery on the issue of personal jurisdiction. This Court, after reviewing the affidavits submitted by the parties in light of the relevant case law, determined that discovery would elucidate certain material facts and therefore should be allowed, limited to the following issues: 1) Where the last act necessary for completion of the contract occurred;[1] 2) Where material performance of the contract was centered;[2] and 3) Where title passed.[3]

After conducting nearly three months of discovery, the parties have now supplied the Court with numerous transcripts of depositions, as well as more detailed affidavits. This evidence presents a virtually undisputed version of the facts. Although plaintiff argues that material facts remain in dispute (which should be construed in favor of plaintiff), a detailed reading of the new affidavits and deposition testimonies reveal little, if any, discrepancies among the various witnesses and affiants as to the events that transpired during the negotiation, execution, and performance of the contract. Rather, it is the legal conclusions spun from the facts that are disputed.

Michael Peragine, president of all three movants, became interested in a Westwind–I Turbo Jet Aircraft in early 1994. In June 1994, Charles "Skip" Copeland (an Executive and East Coast employee) saw an advertisement (in New York) for plaintiff's aircraft, which plaintiff had placed in a national publication. In response to the advertisement, on June 16, 1994, Copeland sent a letter via facsimile (from New York) to plaintiff's broker, Jay Messinger (in Colorado). Messinger responded (to New York) on the same date. The next day, Messinger (in Colorado) had a telephone conversation with Peragine (in New York). According to Messinger, Peragine made an offer to purchase the

1. See Hydrokinetics, Inc. v. Alaska Mechanical, Inc., 700 F.2d 1026, 1030 (5th Cir.1983), (where contract provides no choice of law, "place where contract was completed was relevant to the reasonable foreseeability that 'enforcement and protection of [defendant's] own rights under the contract might depend on the [forum state's] laws'") (quoting Product Promotions, Inc. v. Cousteau, 495 F.2d 483, 497 (5th Cir.1974)).

2. See Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773, 778 & n. 2 (5th Cir.1986),; Hydrokinetics, 700 F.2d at 1030; Polythane Systems, Inc. v. Marina Ventures Int'l, Ltd, 993 F.2d 1201, 1205 (5th Cir.1993) ("place where the contract is performed is a 'weighty consideration'") (quoting Command–Aire Corp. v. Ontario Mech. Sales & Serv., Inc., 963 F.2d 90, 94 (5th Cir.1992)).

3. See Polythane Systems, 993 F.2d at 1205–06 & n. 6.

plane during this telephone conversation.[4] A week or two later, Copeland went to Louisiana to spend two weeks with a close friend, Lois Legendre. Although the trip had been planned since April 1994, Copeland made arrangements to come down a day or two earlier than planned so that he could see the aircraft that plaintiff had advertised for sale. He spent two hours with plaintiff's pilot, Ward Allen Miles, looking the aircraft over, checking the logs, etc. Plaintiff argues that Miles and Copeland "negotiated" at this meeting. However, the deposition testimony of the two men is consistent that neither of them had authority to negotiate any terms regarding the sale of the aircraft and that no terms of the contract were debated or settled upon at this meeting.

Over the course of July 1994, Miles and Peragine worked out certain terms of the proposed purchase during numerous telephone and fax communications. Miles drafted a "Purchase Agreement," which he sent to Peragine in New York. Peragine signed it (in New York) on behalf of Executive on August 1, 1994 and sent it back to Miles. Miles then signed it (in Louisiana) on behalf of plaintiff. Although this August 1st agreement is captioned "Purchase Agreement," it contains no commitment on the part of Executive to purchase the aircraft. On the contrary, the agreement states that Buyer (Executive) "hereby makes the following offer to purchase said aircraft." The agreement obligates the Buyer to place $54,414.17 ($50,000 deposit and $4,414.17 for cost of relocating plane to New York) in escrow and obligates the Seller (plaintiff) to relocate the plane to New York for "review" by Buyer. It provides for a "pre-purchase" inspection by Buyer and obligates Buyer to return the plane to pre-inspection condition if it "is not purchased by Buyer." The $50,000 deposit is to be returned to Buyer "if the Buyer rejects

the aircraft," but the $4,414.17 is to "be distributed to Seller if aircraft is not bought by Buyer." Essentially, the entire transaction remained "subject to the acceptance of the aircraft by Buyer."

On August 2 or 3, 1994, after DAH had forwarded the $54,414.17 to the escrow agent (in Oklahoma), Miles flew the plane to New York with Copeland as co-pilot (Copeland, of course, had to travel to Louisiana to serve as co-pilot for the trip). After the pre-purchase inspection and demo flight, Miles and Peragine worked out the terms of another "Purchase Agreement," dated August 10, 1994. This agreement was negotiated, drafted, and executed in New York by Peragine (on behalf of Executive) and Miles (on behalf of plaintiff).

In contrast to the August 1st agreement, which contained only an "offer to purchase" on the part of Executive, the August 10th agreement states that Buyer "hereby agrees to purchase" and Seller "hereby agrees to sell the above referenced aircraft." The agreement further states that it "supersedes the original Purchase Agreement." It provides that the Buyer will furnish hangar space for the aircraft but that "Buyer does not take any possessional rights until all of the terms of this Agreement are completed." The agreement defines the "Closing Date" as on or before September 11, 1994. In this agreement, Executive agrees that it has inspected the aircraft and accepts the aircraft in its present condition, subject to Seller delivering the aircraft free of encumbrances, delivering all documents necessary to record the sale and register the aircraft in the United States, and other obligations of a similar nature. The agreement obligates Buyer to place $545,585.23 in escrow by August 17, 1994 and to place an additional $1 million in escrow on the closing date.

---

4. This fact appears to be contested by the movants. It is, however, not determinative, for even if Messinger had been in Louisiana rather than Colorado, the exchange of communications between the defendant's domicile and the forum state are not weighed heavily. *See Holt,* 801 F.2d at 778 (exchange of communications between defendant's domicile and forum state in developing contract was insufficient to constitute purposeful availment because it "rested on noth-

ing but 'the mere fortuity that [plaintiff] happen[ed] to be a resident of the forum' ") (quoting *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir.1985)); *Hydrokinetics,* 700 F.2d at 1029 (exchange of communications between defendant's domicile and forum state in the development of the contract is "insufficient to be characterized as purposeful activity invoking the benefits and protections of the forum state's laws").

After the August 10th agreement had been executed, Miles locked the aircraft, with all of its relevant documents locked inside, and left New York with the only keys to the aircraft in his possession. Executive then assigned the August 10th Purchase Agreement to DAH with plaintiff's consent. On August 16, 1994, DAH forwarded the $545,585.23 to the escrow agent (in Oklahoma). DAH forwarded the remaining $1 million to the escrow agent (in Oklahoma) on September 1, 1994. Plaintiff then sent a letter via facsimile to the escrow agent (in Oklahoma) authorizing the escrow agent to release the bill of sale, which had been executed previously by plaintiff (in Louisiana) and sent to the escrow agent to hold in Oklahoma until the closing of the transaction. On September 2 or 3, 1994, Peragine received the keys to the aircraft in New York via overnight carrier.

■ ANALYSIS: "A nonresident defendant is amenable to personal jurisdiction in a federal diversity suit to the extent permitted by a state court in the state in which the federal court resides." *Polythane Systems, Inc. v. Marina Ventures International, Ltd.,* 993 F.2d 1201, 1205 (5th Cir.1993) (quoting *Bullion v. Gillespie,* 895 F.2d 213, 215 (5th Cir.1990)). Because the Louisiana long-arm statute reaches to the full extent permitted under the Constitution,[5] the analysis here is limited to whether the exercise of jurisdiction over the movants "comports with the due process concerns of the fourteenth amendment." *Polythane,* 993 F.2d at 1205. The due process inquiry is two-fold: 1) the "[d]efendant must have some minimum contacts with the state resulting from an affirmative act or acts on its part;" and 2) "it must not be unfair or unreasonable to require the nonresident defendant to defend the suit in the forum." *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.,* 700 F.2d 1026, 1028 (5th Cir.1983).

■ "Personal jurisdiction over a nonresident defendant can be general or specific." *Polythane,* 993 F.2d at 1205. However, plaintiff concedes that none of the movants have had the "systematic and continuous" contacts with Louisiana necessary to support general jurisdiction. *Id.* Instead, plaintiff seeks to establish specific jurisdiction. "To exercise specific jurisdiction, the court must examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice." *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 777 (5th Cir.1986).

■ The movants' only contacts with Louisiana relating to the dispute at issue are the following: 1) Executive/DAH entered into a contract with a Louisiana entity; 2) Skip Copeland traveled twice to Louisiana; and 3) in negotiating the transaction, Copeland and/or Peragine exchanged numerous communications with plaintiff via telephone, facsimile, and/or mailings.[6]

■ It is well settled that "merely contracting with a resident of the forum state is insufficient to subject the nonresident to the forum's jurisdiction." *Holt,* 801 F.2d at 778. Nor is "[t]he number of contacts with the forum state ... by itself, determinative." *Hydrokinetics,* 700 F.2d at 1028. The question for the Court is "whether the contacts suggest that the nonresident defendant purposefully availed himself of the benefits of the forum state." *Id.* (quoting *Brown v. Flowers Indus., Inc.,* 688 F.2d 328, 333 (5th Cir.1982)). "'Considerations such as the quality, nature, and extent of the activity in the forum, the foreseeability of consequences within the forum from activities outside it, and the relationship between the cause of action and the contacts, relate to whether it can be said that the defendant's actions constitute "purposeful availment."'" *Id.* (quoting *Prejean v. Sonatrach, Inc.,* 652 F.2d 1260, 1268 (5th Cir.1981)). "The unilateral activity of those who claim some relationship

---

**5.** *See Superior Supply Co. v. Associated Pipe & Supply Co.,* 515 So.2d 790, 792 (La.1987).

**6.** Plaintiff argues that Executive also initiated the first contact. This contention, however, is not supported by the evidence. The deposition testimony is undisputed that Copeland's fax to plaintiff's broker asking to be sent the aircraft's specifications was in response to reading in a national publication that the aircraft was for sale. Moreover, even if this inquiry could be considered the "first contact," it was sent not to Louisiana, but to plaintiff's broker in Colorado.

with a nonresident defendant cannot satisfy the requirement of contact with the forum state.'" *Id.* (quoting *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1239–40, 2 L.Ed.2d 1283 (1958)).

Skip Copeland's two trips to Louisiana cannot support specific jurisdiction. As explained earlier, Copeland went to view the aircraft while in Louisiana to visit a close friend. Copeland's second trip was to serve as co-pilot when the aircraft was relocated to New York for the prepurchase inspection and demo flights. In *Hydrokinetics, Inc. v. Alaska Mechanical, Inc.,*[7] officers of the non-resident defendant made two visits to the forum state, once to inspect the plaintiff's facilities and a second time to resolve a dispute between the parties. The Fifth Circuit found this contact to be "relevant" but not "sufficient to alter the basic quality and nature of the [defendant]'s contact with the [forum] state." *Id.* at 1029. Compared to the forum visits in *Hydrokinetics,* Copeland's visits to Louisiana are even further removed from the contract at issue, particularly in light of Copeland's personal friendship with Louisiana resident, Lois Legendre, whom Copeland saw during both visits. Certainly, these visits, by themselves, are far from "purposeful availment."

Likewise, the exchange of communications between New York and Louisiana during the development and performance of the contract "is also insufficient to be characterized as purposeful activity invoking the benefits and protections of the forum state's laws." *Hydrokinetics,* 700 F.2d at 1029. These messages to Louisiana "rested on nothing but 'the mere fortuity that [plaintiff] happens to be a resident of the forum.'" *Holt,* 801 F.2d at 778 (quoting *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1147 (5th Cir.1985)).

■ In a case such as this one, in which the plaintiff is seeking to establish specific jurisdiction relating to a single transaction, one of the most pivotal considerations in determining whether there has been "pur-

poseful availment" is where the material performance of the contract was centered. *See Command–Aire Corp. v. Ontario Mechanical Sales & Serv. Inc.,* 963 F.2d 90, 94 (5th Cir.1992); *Holt,* 801 F.2d at 778; *Hydrokinetics,* 700 F.2d at 1029, 1030. Virtually all of Executive's obligations, under both the August 1st and the August 10th contracts, were required to be fulfilled in Oklahoma— specifically, by forwarding payments to the escrow agent. As for plaintiff's performance, nearly all of plaintiff's obligations were required to be performed in New York—providing demo flights, delivering necessary documents, delivering the keys to the aircraft at closing, etc. The only aspect of plaintiff's performance made outside New York was delivery of the bill of sale to the escrow agent in Oklahoma, to be sent to New York upon receipt of the $1 million on the closing date.[8] The only contractual performance rendered in Louisiana was Executive's furnishing of a co-pilot for relocation of the aircraft to New York, and the significance of this one task pales against the swarm of performance that converged around New York and Oklahoma.

■ Unlike the contracts at issue in *Hydrokinetics* and *Holt,* neither of the agreements in this case contain forum-selection clauses. Consequently, "the place where the contract was completed [is] relevant to the reasonable foreseeability that 'enforcement and protection of [defendant's] own rights under the contract might depend on the laws of [the forum state].'" *Hydrokinetics,* 700 F.2d at 1030. Although the August 1st agreement was signed last by Miles in Louisiana, the significance of this is reduced by the existence of a superseding agreement, which was negotiated and executed by both parties in New York.

Also relevant in determining whether specific jurisdiction exists is where title to the aircraft passed. *See Polythane,* 993 F.2d at 1205; *Command–Aire,* 963 F.2d at 94. The Court need not decide whether New York or

---

7. 700 F.2d 1026 (5th Cir.1983).

8. Plaintiff asks the Court to attribute weight to Louis St. Martin's signing the bill of sale in Louisiana before delivering it to the escrow agent. However, because plaintiff's decision to

perform this obligation "within its own forum state [was] totally unilateral, it cannot be viewed as purposeful on the part of the nonresident." *Command–Aire,* 963 F.2d at 94.

Louisiana law should be applied in making this determination, for the result is the same under each. Under New York law, "title passes to the buyer at the time and place at which the seller completes his performance with reference to the physical delivery of the goods." *See* N.Y.U.C.C. § 2–401 (McKinney 1993). Based upon the language of the contracts, as well as the deposition testimony and supporting documents, it is clear that delivery of the aircraft did not take place until the bill of sale and the keys to the aircraft were delivered to DAH in New York on September 2 or 3, 1994. Under Louisiana law, "[o]wnership is transferred between the parties as soon as there is agreement on the thing and the price is fixed, even though the thing sold is not yet delivered nor the price paid." La.Civ.Code Ann. art. 2456 (West Supp.1996). However, where, as here, "the buyer has reserved the view or trial of the thing, ownership is not transferred from the seller to the buyer until the latter gives his approval of the thing." La.Civ.Code Ann. art. 2460 (West Supp.1996). In this case, the buyer gave its approval of the aircraft (subject to certain performances by plaintiff) in New York on August 10 or 11, 1994, after all prepurchase inspections and demo flights had been performed. Thus, under either New York law or Louisiana law, title to the aircraft passed in New York.

Considering the quality, nature, and extent of the movant's activities within Louisiana, as well as the association between these contacts and the instant litigation, the Court finds that none of the movants' contacts with Louisiana can support a finding of purposeful activity invoking the benefits and protections of Louisiana. Because the Court finds that the movants do not have the requisite minimum contacts with the forum necessary to support the exercise of jurisdiction over them, the Court need not address the fairness tier of the due process inquiry.

For the foregoing reasons, IT IS ORDERED that the motion to dismiss for lack of personal jurisdiction, filed by defendants Diversified Aircraft Holdings, Ltd., Executive Airways, Ltd., and East Coast Aviation Services, Ltd., is HEREBY GRANTED, and plaintiff's claims against these three defen-

dants are HEREBY DISMISSED without prejudice.