OPINION


No. 04-04-00813-CV

CREDIT COMMERCIAL DE FRANCE, S.A., Finely, S.A., and 
HSBC Private Banking, Ltd., f/k/a Handelsfinanz-CCF Bank International Ltd.,
Appellants

v.

R. MORALES, H.R. Baxter, and V.B. Elizalde, 
individually and on behalf of a class of all others similarly situated,
Appellees

From the 150th Judicial District Court, Bexar County, Texas
Trial Court No. 2001-CI-13368
Honorable Janet Littlejohn, Judge Presiding
 
Opinion by:    Karen Angelini, Justice
 
Sitting:            Alma L. López, Chief Justice
Karen Angelini, Justice
Sandee Bryan Marion, Justice
 
Delivered and Filed:   February 15, 2006

REVERSED AND RENDERED
            This is an accelerated, interlocutory appeal of the trial court’s order overruling the special
appearances of Credit Commercial de France, S.A., Finely, S.A., and HSBC Private Banking, Ltd.
f/k/a Handelsfinanz-CCF Bank International, Ltd. Because we conclude that a Texas court cannot
assert personal jurisdiction over any of these entities, we reverse the trial court’s order and render
judgment dismissing the claims against them for want of jurisdiction. 
Procedural Background
            Appellees Rosana Morales and Hugo Baxter (“Sharp investors”), Mexican nationals from
Monterrey, Mexico, represent a class of investors from Mexico who invested money through Sharp
Capital, Inc. (“Sharp”) and subsequently lost $50 million upon Sharp’s financial collapse. The Sharp
investors allege that Appellants Credit Commercial de France, S.A. (“CCF”), Finely, S.A. (“Finely”),
and HSBC Private Banking, Ltd. f/k/a Handelsfinanz-CCF Bank International, Ltd. (“HF-CCFI”)
assisted Sharp in its scheme to disguise Sharp’s true financial situation and the type of investments
it was acquiring. The Sharp investors sued appellants for violations of the Texas Securities Act,
aiding and abetting Sharp to commit violations of the Texas Securities Act, conspiracy to violate the
Texas Securities Act, participation in breach of fiduciary duty, aiding and abetting Sharp to commit
fraud, conspiracy to commit fraud, aiding and abetting Sharp to commit conversion, conspiracy to
commit conversion, fraudulent conveyance, fraud in stock transactions, negligence, gross negligence,
and civil RICO.
            In response, CCF, Finely, and HF-CCFI all filed special appearances, arguing that they are
not subject to personal jurisdiction in Texas. After a three-day hearing, the trial court overruled their
special appearances, determining that they are subject to personal jurisdiction in Texas. CCF, Finely,
and HF-CCFI appeal the trial court’s order. 
Factual Background
            Sharp, a Texas Corporation, was formed in 1986 by Mauricio Gutierrez and executives of
Casa de Bolsa Arka (“Arka”), a Mexican investment brokerage owned and controlled by Humberto
Lobo and his family, who also owned the Mexican industrial conglomerate Grupo Protexa
(“Protexa”). The executives of Arka established Sharp in San Antonio, Texas as the American
finance branch for Arka. Sharp was charged with administering Arka’s clients’, Lobo’s, and
Protexa’s non-Mexican investments. Sharp was registered with the Securities and Exchange
Commission (“SEC”) as an investment advisor under the Investment Advisor’s Act, and Gutierrez
served as President and Managing Director of Sharp. Although founded in San Antonio, Sharp’s
administrative office later moved to Irving, Texas, where Gutierrez resided. Although the Lobo
family helped found Sharp, in 1994, the Lobo family transferred its interest in Sharp to Gutierrez. 
            Sharp provided investment advice to Mexican national investors. The investors would
establish account agreements with Sharp and would send money to Sharp for investment purposes.
At first, NationsBank acted as the custodian for the investors’ funds and assets, while Sharp
possessed a power of attorney from each investor, allowing it to engage in securities transactions on
their behalf. Later, Sharp itself became the custodian of the investors’ funds and investment assets.
            Here, Rosana Morales and Hugo Baxter represent a class of Sharp investors. Both are
Mexican citizens who reside in Monterrey, Mexico, and both invested money in Sharp and signed
custodial agreements with Sharp. According to the Sharp investors, as Mexican nationals, investing
through Texas-based Sharp was attractive because it allowed them to invest in dollar-denominated
instruments, thereby avoiding the insecurity associated with Mexico’s frequent currency
devaluations. And, according to the Sharp investors, they believed that Sharp was investing their
money in low-risk investments. In fact, however, Sharp was investing their money in high-risk
investments without their knowledge. 
            Although Sharp did not have a license in the United States to operate a mutual fund, it
operated like one, pooling the investors’ funds. In 1993, Sharp was the subject of a surprise SEC
regulatory audit. As a result of its review, on October 5, 1993, the SEC sent Gutierrez a letter
informing him that Sharp’s practices were in violation of U.S. securities law. In particular, the SEC
found that “Sharp’s pooling of client funds for the purchase of Eurobonds and the making of loans”
met the definition of a “mutual fund” under the Investment Company Act. The SEC also criticized
Sharp for engaging in leveraged transactions using its clients’ funds, noting that neither the leveraged
transactions nor the risk associated with them had been disclosed to or approved by Sharp’s clients.
The SEC warned Gutierrez that continuing these types of activities could violate the anti-fraud
section of the Advisor’s Act.
            In response to the SEC’s investigation and warnings, Gutierrez began looking for a way to
evade SEC regulation and U.S. securities laws. Gutierrez’s plan was to create an offshore company
that he could control from Texas but would be located outside of the SEC’s jurisdiction. He would
transfer all of Sharp’s assets to the new offshore entity, which in turn, would become a “service
provider,” sending Sharp investment confirmations. Sharp would serve as the investment advisor to
the offshore company. When NationsBank refused to continue serving as the lender of record, Sharp
began looking for another lender registered with the Mexican Treasury Department, Hacienda,


 to
act as the lender of record on the “participated loans transactions” in order to roll over the existing
NationsBank loans to the new lender. CCF, a bank registered with Hacienda, and its subsidiary,
Finely, suited Sharp’s needs. According to Gutierrez, CCF and its subsidiary, Finely, were attractive
partners because of their presence and experience in the international markets, especially in emerging
markets.
            CCF is a French commercial bank headquartered in Paris, France. Finely, is a subsidiary of
CCF and has its only office in Paris. During the 1990s, Finely arranged financing in the emerging
markets, including loans with CCF and other banks. Neither CCF nor Finely has ever maintained
assets, a bank account, a tax domicile, representatives or a registered agent in Texas. 
            Roman Kamir, the Director of Finely, first met Gutierrez in Mexico in 1995 while there on
business. Gutierrez contacted Kamir and Christian Deseglise, Kamir’s subordinate, inquiring
whether CCF could be willing to act as the lender of record. According to Gutierrez, Kamir and
Deseglise informed him that CCF was registered with Hacienda and would be willing to act as the
lender. Thus, in November 1995, Gutierrez traveled to Paris, France to meet with Kamir and
Deseglise. At that meeting, Gutierrez informed Kamir and Deseglise that he was looking for an
offshore service provider that would hold Sharp’s assets and would send account statements to
Sharp. According to Gutierrez, Kamir recommended creating a new entity in the Bahamas because
CCF already had its subsidiary, HF-CCFI, in the Bahamas. 
            HF-CCFI is a Bahamian banking corporation whose headquarters and principal place of
business, personnel, facilities, and assets are located in Nassau, the Bahamas. In March 1996, Kamir
and Gutierrez traveled together to visit HF-CCFI in the Bahamas, where Kamir introduced Gutierrez
to Ferdinand Menconi, general manager of HF-CCFI, and Ivano Alliata, executive vice president of
HF-CCFI. Gutierrez explained to Menconi and Alliata that Sharp wanted to create an offshore entity
that would hold assets for the benefit of Sharp, would buy and sell securities on Sharp’s behalf, and
would send Sharp confirmations of assets. At the meeting, Gutierrez decided to engage HF-CCFI’s
affiliate, HF Consulting, to form EMCA. Menconi then sent Gutierrez correspondence dated June
11, 1996, explaining HF-CCFI’s Bahamian banking services and the Bahamian services of HF
Consulting for setting up offshore companies. Gutierrez appointed a friend from San Antonio, Luis
Montes de Oca, as the person to handle the establishment of EMCA for Sharp. 
            In June 1996, Deseglise and another Finely employee, Carole Bortoli, traveled to Texas to
visit InverWorld, CCF’s client, in San Antonio, Texas. In traveling from Paris to San Antonio, the
only flight Deseglise could book stopped in Dallas, Texas. So, although he had not planned to meet
with Gutierrez during his short stop in Dallas, he decided to call Gutierrez and inform him that he
would be in Dallas. Deseglise testified that there was no business objective in meeting with
Gutierrez; it was a “courtesy visit.” According to Deseglise, although he and Gutierrez discussed the
state of their business relationship, the visit was “more of a social visit than something which had
to do with specific transactions.” According to Montes de Oca, who was also present at this meeting,
Deseglise and Gutierrez discussed the new offshore company that was to be created.
            After the meeting, on June 17, 1996, Deseglise faxed a letter to Gutierrez outlining various
financial services, including custody and clearing services, that CCF and Finely could provide to the
new offshore company that Gutierrez was going to form in the Bahamas with HF-CCFI. Also
following that meeting, Gutierrez, Montes de Oca, and HF-CCFI’s Alliata formed EMCA. Once
EMCA was established, Gutierrez transferred all of Sharp’s clients’ investment assets to EMCA. 
            Through EMCA, Gutierrez invested in emerging-market bonds at high margins. In order to
engage in this leveraged bond trading with CCF, on July 29, 1996, Sharp executed a Global
Repurchase Agreement with CCF. Deseglise signed this agreement as “attorney-in-fact” for CCF.
Gutierrez also had Alliata direct his employees to sign another Global Repurchase Agreement with
CCF so that Gutierrez could have EMCA incur leverage to purchase emerging market bonds from
CCF.
            Through the Repurchase Agreements with CCF, Sharp and EMCA were able to purchase
emerging bond markets from CCF on margin, with margin loan ratios of up to ninety percent.
Through these Repurchase Agreements, CCF, with the assistance of its subsidiary Finely acting as
the “arranger,” provided about $50 million in margin financing to Sharp or EMCA for the purchase
of emerging market bonds between 1996 and 1998.
            In 1997, Gutierrez and Martinez traveled to Paris to meet with Kamir and Deseglise. At that
meeting, Kamir discussed the profitability of certain securities issued by the Venezuelan government
called “front loaded interest reduction bonds,” or “FLIRBs.” Gutierrez decided to invest in FLIRBs,
and CCF provided margin financing up to 90% to EMCA so that Gutierrez could purchase $27
million worth of FLIRBs. 
            In the summer of 1998, with the collapse of the Russian ruble, the emerging bond market
crashed. CCF and other lending institutions began making margin calls on EMCA. To satisfy the
margin calls, in August 1998, CCF began selling the FLIRBs at record lows. However, the FLIRB’s
price had dropped to such a low level that CCF informed Gutierrez that the FLIRBs were not
sufficient to satisfy the margin calls. As such, CCF began foreclosing on other valuable assets that
it held in custody for Sharp/EMCA. 
            CCF then demanded that Gutierrez assign to CCF all of the participated loans held by EMCA
for the benefit of Sharp’s clients, including the Protexa loans. Gutierrez entered into an assignment
agreement with CCF, whereby EMCA transferred to CCF all of its title and interest in the eleven
participated loans that EMCA held. 
            In the Fall of 1998, the SEC launched yet another investigation of Sharp and EMCA. It filed
an enforcement action against Sharp and EMCA in federal district court. It then intervened into
Sharp’s management and froze Sharp’s and EMCA’s assets. A special master was appointed to
liquidate the company. In March 2001, Gutierrez, Martinez, and other Sharp employees were
indicted by a federal grand jury for securities and wire fraud. In June 2001, Gutierrez entered into
a plea agreement, whereby the Justice Department agreed not to prosecute him for any offense he
committed in connection with his involvement with HF-CCFI.
            The Sharp investors then sued CCF, Finely, and HF-CCFI for their involvement with Sharp’s
actions, and in response, appellants filed a special appearance, claiming that they were not subject
to personal jurisdiction in Texas. The trial court denied their special appearance, which they now
appeal.
Standard of Review
            In a special appearance, the plaintiff bears the initial burden of pleading sufficient allegations
to bring the nonresident defendant within the provisions of the long-arm statute. BMC Software
Belgium, N.V. v. Marchand, 83 S.W.3d 789, 793 (Tex. 2002). A defendant challenging a Texas
court’s personal jurisdiction over it must negate all jurisdictional bases. Id. 
            Whether a court has personal jurisdiction over a defendant is a question of law. Id. at 794.
However, the trial court frequently must resolve questions of fact before deciding the jurisdiction
question. Id. If a trial court enters an order denying a special appearance, and the trial court issues
findings of fact and conclusions of law, the appellant may challenge the fact findings on legal and
factual sufficiency grounds. Id. 
            A trial court’s conclusions of law are reviewed as a legal question. Id. The appellant may not
challenge a trial court’s conclusions of law for factual insufficiency; however, the reviewing court
may review the trial court’s legal conclusions drawn from the facts to determine their correctness.
Id. If the reviewing court determines a conclusion of law is erroneous, but the trial court rendered
the proper judgment, the erroneous conclusion of law does not require reversal. Id.
            When a trial court does not issue findings of fact and conclusions of law with its special
appearance ruling, all facts necessary to support the judgment and supported by the evidence are
implied. Id. at 795. When the appellate record includes the reporter’s and clerk’s records, these
implied findings are not conclusive and may be challenged for legal and factual sufficiency. Id.
In Personam Jurisdiction
            The Texas long-arm statute governs Texas courts’ exercise of jurisdiction over nonresident
defendants. See Tex. Civ. Prac. & Rem. Code Ann. §§ 17.041–.045 (Vernon 1997 & Supp. 2005).
The long-arm statute permits Texas courts to exercise jurisdiction over a nonresident defendant that
“does business” in Texas. BMC Software, 83 S.W.3d at 795. The supreme court has held that the
long-arm statute’s broad language extends as far as the federal constitutional requirements of due
process permit. Id. Thus, in determining whether a nonresident defendant has met its burden to
negate all bases of jurisdiction, we rely on precedent from the United States Supreme Court and
other federal courts, as well as our own State’s decisions. Id. 
            Personal jurisdiction over nonresident defendants is constitutional when two conditions are
met: (1) the defendant has established minimum contacts with the forum state, and (2) the exercise
of jurisdiction comports with traditional notions of fair play and substantial justice. Int’l Shoe Co.
v. Wash., 326 U.S. 310, 316 (1945); BMC Software, 83 S.W.3d at 795. A nonresident defendant that
has “purposefully availed” itself of the privileges and benefits of conducting business in the foreign
jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. Burger King Corp.
v. Rudzewicz, 471 U.S. 462, 474-76 (1985); BMC Software, 83 S.W.3d at 795. Although not
determinative, foreseeability is an important consideration in deciding whether the nonresident
defendant has purposefully established “minimum contacts” with the forum state. BMC Software,
83 S.W.3d at 795. However, a defendant should not be subject to a foreign court’s jurisdiction based
upon “random,” “fortuitous,” or “attenuated” contacts. Burger King, 471 U.S. at 475; BMC Software,
83 S.W.3d at 795. And, because of the unique and onerous burden placed on a party called upon to
defend a suit in a foreign legal system, the minimum contacts analysis is particularly important when
the defendant is from a different country. BMC Software, 83 S.W.3d at 795.
            Personal jurisdiction exists if the nonresident defendant’s minimum contacts give rise to
either specific or general jurisdiction. Helicopteros Nacionales de Colombia, S.A. v. Hall, 466 U.S.
408, 413-14 (1984); BMC Software, 83 S.W.3d at 795-96. Specific jurisdiction is established if the
defendant’s alleged liability arises from or is related to an activity conducted within the forum. BMC
Software, 83 S.W.3d at 796. In contrast, general jurisdiction is present when a defendant’s contacts
in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over
the defendant even if the cause of action did not arise from or relate to activities conducted within
the forum state. Id. Here, the trial court determined that the appellants were subject to specific
jurisdiction, and neither party argues that general jurisdiction would apply.
Credit Commercial De France, S.A. and Finely, S.A.
A.        Specific Personal Jurisdiction
            1.         Directed-a-Tort Jurisdiction
            We must first determine whether CCF and Finely (“the CCF Defendants”) are subject to
specific jurisdiction. In their brief, the Sharp investors urge us to follow Nocando Memorial
Holdings, Ltd. v. Credit Commercial de France, S.A., in which a federal district court found the CCF
Defendants


 to be subject to personal jurisdiction in Texas. See Nocando Mem Holdings, Ltd. v.
Credit Commercial de France, S.A., No. SA-01-1194-XR, 2004 WL 2603739 (W.D. Tex. Oct. 6,
2004). In doing so, the federal court noted that the case was unusual because the InverWorld
investors “are asserting tort claims against the CCF Defendants while relying chiefly on the CCF
Defendants’ contractual dealings with Sharp and EMCA in their attempt to establish specific
jurisdiction.” Id. at *18. That is, “[r]ather than complaining about the breach of a contract between
the plaintiff and defendant, plaintiffs are non-parties to the contract who claim they were harmed by
Defendants’ intentional tortious activity, part of which was carried out through the performance of
contracts.” Id. As here, the plaintiffs in Nocando were not parties to any contract with CCF, and their
claims did not arise out of a breach of any contract. Id. at *19. The federal court concluded that “the
minimum contacts standard applied to intentional tort cases is the governing standard, and not the
contracts minimum contacts standard applied in breach of contract cases.” Id. The federal court
reasoned that the intentional torts standard must apply “because a defendant must reasonably
anticipate that he could be haled into a Texas court because of his alleged conduct, and the mere
performance of a contract, without more, would not ordinarily cause a defendant to reasonably
anticipate being haled into court to answer for an alleged intentional tort against a third party.” Id.
As such, the federal court held the following: 
[I]n an intentional tort case arising from contractual or business relationships, it
should not be enough to demonstrate only that a defendant could foresee some
consequences or effects in Texas. Instead, the defendant must intend or reasonably
foresee the harmful consequences that give rise to the plaintiff’s claims. Thus, in this
case, Plaintiffs must establish a prima facie case that Defendants engaged in conduct
directed at Texas with knowledge that the intended goal was to falsify the books of
InverWorld, thereby causing harmful consequences in Texas. It would not be fair and
reasonable to hale Defendants into court in Texas for the alleged fraud on InverWorld
investors based solely on Defendants’ innocent business dealings with Sharp and
EMCA, even if those business dealings were sufficient to subject Defendants to
specific personal jurisdiction for claims arising between the parties to the business
deals. However, it would be fair and reasonable, and thus consistent with due
process, to hale them into court in Texas if they knowingly engaged in their business
deals with these Texas entities by “cleaning” the books of a Texas-based company.
Because personal jurisdiction cannot be exercised over CCF based on the acts of the
other alleged co-conspirators, there must be some act by CCF directed at Texas in
furtherance of the scheme, coupled with its knowledge that the action or its
consequences would result in the “cleaning” of InverWorld’s books.

Nocando, 2004 WL 2603739, at *20. Applying Nocando’s reasoning, the Sharp investors in their
brief focused on whether the record reflected that the CCF Defendants intended or reasonably could
have foreseen the harmful consequences that occurred in Texas. In other words, did the CCF
Defendants “direct a tort” toward Texas? 
            However, since that time, the Texas Supreme Court issued its opinion in Michiana Easy
Livin’ Country, Inc. v. Holten, 168 S.W.3d 777 (Tex. 2005). In Michiana, the supreme court
criticized the type of directed-a-tort jurisdiction applied in Nocando:
Several problems arise if jurisdiction turns not on a defendant’s contacts, but on
where it “directed a tort.” First, it shifts a court’s focus from the relationship among
the defendant, the forum, and the litigation to the relationship among the plaintiff, the
forum, and the litigation. The place where a plaintiff relies on fraud may determine
the choice of law, but choice-of-law analysis considers all parties, local courts, legal
policies, interested states, and the interstate and international systems. By contrast,
minimum-contacts analysis focuses solely on the actions and reasonable expectations
of the defendant. 
 
Second, directed-a-tort jurisdiction confuses the roles of judge and jury by equating
the jurisdictional inquiry with the underlying merits. If purposeful availment depends
on whether a tort was directed toward Texas, then a nonresident may defeat
jurisdiction by proving there was no tort. Personal jurisdiction is a question of law
for the court, even if it requires resolving questions of fact. But what if a judge and
jury could disagree? May a trial judge effectively grant summary judgment in a local
jurisdiction by deciding contested liability facts in favor of the defendant? And if a
jury absolves a defendant of tort liability, is the judgment void because the court
never had jurisdiction of the defendant in the first place? 
 
Business contacts are generally a matter of physical fact, while tort liability
(especially in misrepresentation cases) turns on what the parties thought, said, or
intended. Far better that judges should limit their jurisdictional decisions to the
former rather than involving themselves in trying the latter.
 
Third, in cases dealing with commerce, a plaintiff often has the option to sue in either
contract or tort. Here, for example, Holten alleged tort, contract, and statutory claims,
as Texas law often allows a plaintiff to do. If directing a tort at Texas is enough, then
personal jurisdiction arises when plaintiffs allege a tort, but not when they allege
breach of contract. Thus, the defendant’s purposeful availment depends on the form
of claim selected by the plaintiff. 
 
Fourth, changes in technology have made reliance on phone calls obsolete as proof
of purposeful availment. While the ubiquity of “caller ID” may allow nonresidents
to know a caller’s telephone number, that number no longer necessarily indicates
anything about the caller’s location. If jurisdiction can be based on phone
conversations “directed at” a forum, how does a defendant avail itself of any
jurisdiction when it can never know where the other party has forwarded calls or
traveled with a mobile phone? . . .
 
For the reasons stated above, we disapprove of those opinions holding that (1)
specific jurisdiction is necessarily established by allegations or evidence that a
nonresident committed a tort in a telephone call from a Texas number, or that (2)
specific jurisdiction turns on whether a defendant’s contacts were tortious rather
than the contacts themselves. 
Id. at 790-92 (emphasis added) (quotations omitted) (citations omitted).
            Thus, the supreme court in Michiana expressly disapproved of finding jurisdiction based on
a tort being directed at Texas. This type of “directed-a-tort jurisdiction” is exactly the type of
jurisdiction on which the court in Nocando based its decision. We, therefore, are precluded from
following Nocando and instead, as directed by Michiana, in determining whether the CCF
Defendants are subject to personal jurisdiction in Texas, will consider the CCF Defendants’ contacts
with Texas.
            2.         The CCF Defendants’ Contacts with Texas
            As noted previously, the minimum-contacts analysis requires that a defendant “purposefully
avail” itself of the privilege of conducting activities within Texas, thus invoking the benefits and
protections of our laws. Am. Type Culture Collection, Inc. v. Coleman, 83 S.W.3d 801, 806 (Tex.
2002), cert. denied, 537 U.S. 1191 (2003) (citing Burger King Corp. v. Rudzewicz, 471 U.S. 462,
475 (1985)). The defendant’s activities, whether they consist of direct acts within Texas or conduct
outside Texas, must justify a conclusion that the defendant could reasonably anticipate being called
into a Texas court. Id. (citing World-Wide Volkswagen Corp. v. Woodson, 444 U.S. 286, 297 (1980)).
In considering a defendant’s contacts with Texas, it is the quality and nature of the contacts, rather
than their number, that is important to the minimum-contacts analysis. Id.
            Here, CCF is a French commercial bank headquartered in Paris, France. Finely, a subsidiary
of CCF, has its only office in Paris, France.


 Neither has maintained a tax domicile, a registered
agent, or representatives in Texas. Nor do they have any bank accounts or assets in Texas. With
regard to CCF’s contractual relationship with Sharp, not one agreement between CCF and Sharp was
executed by CCF in Texas. The situs of the performance for each agreement was in France, where
the loans were made. All loan documentation was prepared in New York City by CCF’s counsel and
reviewed for compliance with Mexican law by counsel in Monterrey. Additionally, the participated
loans specified that the law and jurisdiction of New York would apply. See Michiana, 168 S.W.3d
at 792-93 (noting that insertion of a clause designating a foreign forum suggests that no local
availment was intended); see also Burger King, 471 U.S. at 482 (holding that choice-of-law
provisions should not be ignored in considering whether a defendant has “purposefully invoked the
benefits and protections of a State’s laws”). Likewise, the “repurchase agreements” were entered into
in France by CCF and were all entered into at the request of Gutierrez. Further, the agreements
adopted the application of English law and jurisdiction. The CCF Defendants argue, and we agree,
that these transactions were clearly structured to avoid Texas jurisdiction, not to gain the benefits
and protections of Texas law. Indeed, instead of being structured for the CCF Defendants to gain the
benefits and protections of Texas law, they were structured for Sharp to gain the benefits (in
particular, tax benefits) of foreign jurisdictions like Mexico and the Bahamas. Additionally, the CCF
Defendants emphasize that each transaction was initiated by Gutierrez, who reached out to the CCF
Defendants in France for financial services there. 
             In response, the Sharp investors argue that the CCF Defendants had a four-year ongoing
business relationship with Texas-based Sharp and that the CCF Defendants sold millions of dollars
of financial instruments to Sharp and/or EMCA between 1995 and 1998. The Sharp investors point
to the numerous phone calls and faxes between CCF and Sharp and bank statements that CCF sent
to Sharp in Texas. However, once again, it is not the number of contacts, but the quality, that are
important in a minimum-contacts analysis. First, merely contracting with a resident of the forum
state is insufficient to subject the nonresident to the forum’s jurisdiction. Freudensprung v. Offshore
Tech. Serv., Inc., 379 F.3d 327, 344 (5th Cir. 2004); Holt Oil & Gas Corp. v. Harvey, 801 F.2d 773,
778 (5th Cir. 1986); Televentures, Inc. v. Int’l Game Tech., 12 S.W.3d 900, 910 (Tex. App.—Austin
2000, pet. denied). Thus, the CCF Defendants did not subject themselves to Texas jurisdiction
merely by having a four-year business relationship with Sharp. Second, minimum contacts may not
be satisfied by merely engaging in communications with a Texas corporation during performance
of a contract. Televentures, 12 S.W.3d at 910; see Freudensprung, 379 F.3d at 344 (“[T]his court
has repeatedly held that the combination of mailing payments to the forum state, engaging in
communications related to the execution and performance of the contract, and the existence of a
contract between the nonresident defendant and a resident of the forum are insufficient to establish
the exercise of specific personal jurisdiction over the nonresident defendant.”); Holt, 801 F.2d at 778
(holding that defendant was not subject to specific jurisdiction where nonresident defendant entered
into a contract with a Texas resident, sent an agreement and checks to Texas, and engaged in
extensive telephonic and written communications with the plaintiff in Texas); Stuart v. Spademan,
772 F.2d 1185, 1192-94 (5th Cir. 1985) (finding no specific jurisdiction where nonresident defendant
contracted with Texas residents, directed letters and phone calls to Texas, shipped prototypes and
products to Texas, negotiated a contract with plaintiffs that was to be governed by Texas law, and
marketed his product in Texas). Here, the exchange of communications between CCF and Sharp in
the course of developing and carrying out the contractual obligations are, in themselves, insufficient
to constitute purposeful availment of the benefits and protections of Texas law. Televentures, 12
S.W.3d at 910. 
            The Sharp investors also argue that in furtherance of their relationship with Sharp, the CCF
Defendants’ officers and employees traveled to Texas on at least four occasions. Roman Kamir and
Christian Deseglise, both Finely employees during the time in question, visited Texas. According
to Kamir’s deposition, during the time he worked for Finely, he traveled to Texas about three times:
once to visit Sharp’s offices and the other times in transit to Mexico. According to Kamir, in
Monterrey, Mexico, Finely was “setting up a credit operation for a Mexican company.” He was in
Monterrey with other bankers, and “the Sharp representatives were involved in the operation.” In his
affidavit, Gutierrez affirms that the business meetings occurred in Monterrey, Mexico:
Roman Kamir traveled to Dallas, Texas to meet with me on two occasions, and on
each occasion we traveled together to Monterrey to meet with representatives from
Pulsar. I do not remember the exact dates of those trips, including whether they
occurred before or after my trip to Paris in November, 1995. But either on the way
to or back from Monterrey on at least one of the two trips, Kamir stayed in Dallas,
Texas for a couple of days, and we met at Sharp’s Irving offices to discuss continuing
business between Sharp, and CCF and Finely.

Looking at the testimony of both Kamir and Gutierrez, it is clear that Kamir’s contact with Texas
was incidental. Indeed, both agree Kamir’s visit to Texas was a “stop-over” and that Monterrey,
Mexico was where they traveled for the meeting with the bankers and the Mexican company.            With respect to Deseglise traveling to Texas, he testified in his deposition that he visited
Texas in June of 1996. The purpose of the trip was to meet with another company, InverWorld, in
San Antonio, Texas. On his way to San Antonio, Deseglise had a lay-over in Dallas, Texas. Because
he would be in Dallas (if only for a short time), Deseglise called Gutierrez, told him that he would
be in Dallas, and asked if Gutierrez wanted to meet. According to Deseglise, the request for a
meeting “was more like a courtesy visit. There was no business object and I was not planning, if the
plane had gone directly to San Antonio, I would not have stayed in Dallas and I would not have gone
to Dallas. The reason was to see InverWorld.” Deseglise testified that he met with Gutierrez, and
they went to dinner. They did discuss the state of their business relationship, but that the dinner was
more of a social visit than a business meeting:
Actually when I came back from San Antonio, we had another meeting with
Mauricio Gutierrez, and I said -- I remember joking about that on the way to San
Antonio -- I said, “I am going to see one of your competitors,” because I thought that
they were competing for the same business, which was managing money for Mexican
clients. And I said, “We are thinking about doing clearing services, providing
clearing services for InverWorld.” And [Gutierrez] said that maybe [those services]
could be of interest to me too. I think that at that time, he was doing [those services]
with Swiss Bank, I think, I don’t remember with what company. So I said, well, when
I get back to Paris, I will send you a proposal for how we could be acting as a
clearing service agent.
After Deseglise returned to Paris, CCF sent a proposal to Sharp about clearing services. Thus, only
after Gutierrez expressed interest in CCF’s services did Deseglise send a proposal to Sharp in Texas.
Moreover, as shown through Deseglise and Gutierrez’s depositions, the proposal was never accepted.
            The Sharp investors also point to a letter sent to Sharp by CCF-Finely in 1998 about Brazilian
bonds and another one about a “defeasance” financial structure. However, again, neither one of these
proposals was accepted by Sharp.
            Looking at the quality of CCF and Finely’s contacts with Texas, it is clear that CCF and
Finely did not purposefully avail themselves of the privilege of conducting activities in Texas. Nor
did they invoke the benefits and protections of Texas laws. We, therefore, hold that CCF and Finely
are not subject to personal jurisdiction in Texas. 
HF-CCFI
            HF-CCFI is a Bahamian banking corporation whose headquarters and principal place of
business are in Nassau, the Bahamas. It is an indirectly owned and operated subsidiary of CCF. Its
personnel, facilities, and assets are all located in the Bahamas. It has never had a mailing address,
post office box, or telephone number in Texas. It has never owned, leased, or controlled real property
in Texas. It has never paid, nor been obligated to pay taxes in Texas. It has never advertised nor been
a party plaintiff to any Texas legal proceeding. Further, no HF-CCFI employee or representative has
ever resided in, or traveled to, Texas for the purpose of doing business on behalf of HF-CCFI. No
HF-CCFI employee or representative has ever met in Texas with any employee or representative of
Sharp. Nor has any HF-CCFI employee or representative ever met in Texas with any employee or
representative of EMCA, the Bahamian company owned and controlled by Gutierrez. 
            HF-CCFI recognizes that in 1996, in the Bahamas, Finely introduced Gutierrez to HF-CCFI,
an indirect affiliate of Finely. On March 20, 1996, Gutierrez and Roman Kamir met in the Bahamas
with HF-CCFI’s president, F.M. Menconi, and its vice-president, Ivano Alliata. At that meeting in
the Bahamas, Gutierrez decided to hire HF-CCFI’s affiliate, HF Consulting, to form EMCA as a
Bahamian IBC. On June 11, 1996, Menconi sent Gutierrez correspondence, explaining HF-CCFI’s
Bahamian banking services and HF Consulting’s services for setting up offshore companies. At
Gutierrez’s request, in July 1996, Alliata mailed to Luis Montes de Oca, Gutierrez’s intermediary
in San Antonio, copies of corporate documents regarding the formation of EMCA in the Bahamas,
as well as correspondence relating to opening a Bahamian bank account for EMCA with HF-CCFI. 
Thus, HF-CCFI sent this correspondence to Texas only upon Gutierrez’s request.
            Gutierrez and Martinez of Sharp owned and controlled EMCA. According to HF-CCFI,
consistent with Bahamian customary practice, EMCA had nominal directors in the Bahamas, who
acted only on instructions from EMCA’s owners. The initial nominal EMCA directors were
employees of HF Consulting, not HF-CCFI. HF-CCFI did provide banking services for EMCA at
its Nassau headquarters. From 1996 to 1998, HF-CCFI sent quarterly EMCA account statements
from the Bahamas to Gutierrez in Texas and communicated with Sharp regularly by telephone and
fax regarding EMCA’s banking activities in the Bahamas. At Gutierrez’s request, Alliata faxed
transaction reports from the Bahamas to Sharp, showing the activity that had transpired in EMCA’s
account each day. 
            As such, HF-CCFI’s contacts with Texas consisted of remote communications, such as
telephone calls, faxes, bank statements, and other correspondence, originating in the Bahamas and
relating to the receipt in the Bahamas of funds sent from Texas and to the dispatch of funds from the
Bahamas to Texas from a bank account maintained in the Bahamas by EMCA, a Bahamian entity.
These contacts merely show that it was doing business in the Bahamas and was apprising Sharp of
those Bahamian business activities. Looking at the quality of these contacts with Texas, we hold that
HF-CCFI did not purposefully avail itself of the privilege of conducting activities in Texas; nor did
it invoke the benefits and protections of Texas laws. Instead, by conducting business with HF-CCFI
in the Bahamas, Sharp was invoking the benefits and protections of Bahamian law.


 Therefore, HF-CCFI is not subject to personal jurisdiction in Texas.
Conclusion
            Having determined that CCF, Finely, and HF-CCFI are not subject to personal jurisdiction
in Texas, we reverse the order of the trial court and render judgment dismissing the claims against
CCF, Finely, and HF-CCFI for want of jurisdiction.
Karen Angelini, Justice