KELLY INVESTMENT, INC., Appellant,

v.

BASIC CAPITAL MANAGEMENT, INC.; American Realty Investors, Inc.; Transcontinental Realty Investors, Inc.; Garden Capital Merchandising Mart, Inc.; Continental Poydras Corp. (f/k/a Continental Amoco Corporation); Continental Common, Inc.; Continental Baronne, Inc.; Transcontinental 4400, Inc.; and Art One Hickory Corporation, Appellees.

No. 05–01–01747–CV.

Court of Appeals of Texas, Dallas.

Aug. 6, 2002.

W. Alan Wright, Thomas E. Kurth, Haynes & Boone, L.L.P., Bruce W. Collins, Carrington, Coleman, Sloman & Blumenthal, Dallas, for appellant.

John Augustine Sopuch, J. Robert Arnett, II, Sopuch, Nouhan, Higgins & Arnett, L.L.P., Michael L. Gaubert, Bryan James Wick, Dallas, for appellee.

Before Justices WHITTINGTON, MOSELEY, and RICHTER.

## OPINION

JIM MOSELEY, Justice.

Kelly Investment, Inc. ("Kelly") appeals the trial court's order denying Kelly's special appearance. Kelly contends, in sum, that the trial court erred because there are insufficient contacts to support jurisdiction, and the exercise of jurisdiction over Kelly is inconsistent with traditional notions of fair play and substantial justice. We hold that a nonresident entity, by acquiring promissory notes that it knows are the subject of pending litigation in a Texas state court, thereby establishes sufficient minimum contacts with the state to support that court's exercise of specific personal jurisdiction over the nonresident entity when it is subsequently joined in that litigation. Thus, we affirm the trial court's order.

## BACKGROUND

Appellees are various corporate entities that borrowed money from Dynex Commercial, Inc. In March 1998, three of the appellees executed the three promissory notes (the "Notes") that are the subject of this suit. Each Note is secured by a commercial property located in New Orleans, Louisiana. In April 1999, appellees sued Dynex in Texas for, among other things, failing to advance funds for tenant improvements under the terms of the Notes. Appellees sought set-off against their own obligations under the Notes. In July 2000, although aware of the pending Texas litigation concerning the Notes, Kelly pur-

chased the Notes from Dynex under a Purchase and Sale Agreement (the "Purchase Agreement"). In November 2000, appellees joined Kelly as a defendant in the Texas suit, alleging that Kelly itself breached its obligations under the Notes by failing to advance funds for tenant improvements. Kelly filed a special appearance. After a hearing, the trial court overruled the special appearance without stating its reasons for doing so. This appeal followed.

Because the Texas long-arm statute is broad, its requirements are considered met if the exercise of personal jurisdiction comports with federal due process. *CSR Ltd. v. Link*, 925 S.W.2d 591, 594 (Tex.1996). Federal due process mandates that the defendant "purposefully avail" itself of the privilege of conducting activity within the forum state, thus invoking the benefits and protections of its laws. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985) (random, fortuitous, or attenuated contacts insufficient). The defendant's conduct and connection with the state must be such that it could reasonably anticipate being sued in the forum state. *Id.* We determine whether (1) the nonresident defendant has purposefully established minimum contacts with Texas and, if so, (2) the exercise of jurisdiction comports with "notions of fair play and substantial justice." *Id.*

A defendant's contacts with the forum state can give rise to either general or specific jurisdiction. *CSR*, 925 S.W.2d at 595. Specific jurisdiction arises if the defendant's alleged liability arises from or is related to its contacts within the forum. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 & n. 8, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984). The defendant's purposeful conduct, not the unilateral activity of the plaintiff or others, must

have caused the contact. *Id.* at 417, 104 S.Ct. 1868 (focus is on relationship among defendant, forum, and litigation). In analyzing minimum contacts, it is not the number, but rather the quality and nature of the nonresident defendant's contacts with the forum state that are important. *In re S.A.V.*, 837 S.W.2d 80, 86 (Tex.1992). When a contract with a resident is involved, in evaluating whether the defendant established minimum contacts with the forum state, we are to focus on "prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing." *Burger King*, 471 U.S. at 479, 105 S.Ct. 2174.

A nonresident defendant challenging personal jurisdiction through a special appearance carries the burden of negating all bases of personal jurisdiction. *Kawasaki Steel Corp. v. Middleton*, 699 S.W.2d 199, 203 (Tex.1985). The court of appeals may review fact questions for legal and factual sufficiency, but whether a court has personal jurisdiction over a defendant is a question of law. *BMC Software Belgium, N.V. v. Marchand*, 83 S.W.3d 789, 794 (2002). Once we have determined the evidence is factually sufficient to support the trial court's resolution of disputed fact issues, or if the relevant facts are undisputed, we examine *de novo* whether the facts negate all bases for personal jurisdiction. *Hotel Partners v. Craig*, 993 S.W.2d 116, 120 (Tex.App.-Dallas 1994, pet. denied).

The facts relevant to the issue are undisputed, and appellees join issue with Kelly only on the question whether specific jurisdiction exists. Kelly argues there are insufficient minimum contacts, based on the evidence that it is a California corporation with no place of business in Texas, it negotiated the purchase in Virginia, and the Notes concern properties located in Louisi-

ana. Kelly argues that the mere receipt of payments from Texas parties and the fact that its agent may have placed calls or corresponded with appellees in Texas does not suffice to support personal jurisdiction over it by a Texas court, particularly when those contacts were in response to appellees' inquiries from Texas.[1]

We agree with the general proposition that certain types of contacts do not necessarily constitute sufficient minimum contacts to support the exercise of jurisdiction. *See Burger King*, 471 U.S. at 478, 105 S.Ct. 2174 (merely contracting with out-of-state party does not satisfy minimum contacts); *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir.1996) (merely communicating with and mailing payments to Texas corporation during contract performance did not satisfy minimum contacts); *see also Temperature Sys., Inc. v. Bill Pepper, Inc.*, 854 S.W.2d 669, 675 (Tex. App.-Dallas 1993, writ dism'd by agr.) (payment sent to Texas not minimum contact where contract did not require payment in Texas); *cf. Bissbort v. Wright Printing & Publ'g Co.*, 801 S.W.2d 588, 589 (Tex.App.-Fort Worth 1990, no writ) (payments made in Texas satisfied minimum contacts where contract required them and litigation was about nonpayment).

■ Contrary to Kelly's assertions, however, Kelly's contacts were not limited to the singular type of contacts described above, nor were its contacts random, fortuitous, or attenuated. Kelly knowingly purchased contracts with Texas residents requiring that notices be sent to Texas. Most importantly, however, Kelly initiated a substantial connection with Texas when it purchased the Notes, executed by Texas parties, knowing that the Notes were the subject of pending litigation in Texas in which the prior noteholder was a party. Before the purchase, Kelly's agent, First Commercial Corporation ("First Commercial"), conducted due diligence, examining the litigation documents in this very lawsuit. Thus, Kelly was aware of appellees' claim against Dynex for failure to advance funds and for set-off, and that the claim would affect Kelly as the new noteholder. Under the Purchase Agreement, Kelly specifically agreed to cooperate with Dynex concerning the litigation and contemplated allowing Dynex to pursue rights in Kelly's name. Furthermore, Kelly obligated Dynex to pursue its rights diligently, thus purposefully availing itself of the benefits of the Texas forum. Under the Purchase Agreement, Kelly also explicitly assumed the "litigation risk" of the Texas court case, including the risk of any ruling the Texas court might make concerning tenant-improvement advances under the Notes. Therefore, by executing the Purchase Agreement and thus purchasing the Notes, Kelly undertook a purposeful act that engendered a relationship between Kelly, the Texas forum, and the subject matter of the pending litigation. The nature of the terms of the agreement, and the contemplated future consequences under it, were such that Kelly could reason-

1. Kelly's eight issues reduce to a challenge based on due-process requirements. The issues are: (1) there are insufficient contacts to support general jurisdiction, (2) there are insufficient contacts to support specific jurisdiction, (3) exercising jurisdiction does not comport with traditional notions of fair play and substantial justice, (4) the evidence is factually insufficient to support jurisdiction, (5) any implied fact findings are against the great weight and preponderance of the evidence, (6) the evidence is legally insufficient to support jurisdiction, (7) the trial court incorrectly applied the law, and (8) Kelly established a right to relief as a matter of law. In our discussion we address issues 1, 2, 3, 6, 7, and 8. Because the relevant facts are undisputed, we need not reach issues 4 and 5.

ably have anticipated being haled into the Texas court in this very lawsuit.

Further, not all of Kelly's contacts with the forum after its purchase of the Notes were the result of unilateral acts by appellees. After Kelly bought the Notes, an employee of First Commercial initiated contact with appellees in Texas to inform them that Kelly was the assignee of the Notes and that First Commercial was now the "special servicing agent." Kelly's servicing agent sent monthly payment notices to Texas. While not entirely initiated by Kelly, a predictable continuous course of communication took place between Kelly's agents and appellees; these communications concerned, for example, Kelly's initial decision not to foreclose, its determination whether to advance funds for tenant improvements, and insurance matters. Indeed, it was Kelly's alleged subsequent breach of the same advance clauses in the Notes that prompted appellees to join Kelly in the Texas litigation.

Thus, we conclude Kelly purposefully established sufficient minimum contacts with Texas to satisfy the first prong of the due-process requirements.

### TRADITIONAL NOTIONS OF FAIR PLAY AND SUBSTANTIAL JUSTICE

 The exercise of personal jurisdiction must also comport with traditional notions of fair play and substantial justice. We evaluate the contacts in light of: (1) the defendant's burden; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in the most efficient resolution of controversies; and (5) the states' shared interest in furthering fundamental substantive social policies. *Burger King,* 471 U.S. at 477, 105 S.Ct. 2174. The defendant has the burden to present a compelling case that another

consideration renders jurisdiction in the forum state unreasonable. *Id.* Only rarely will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state. *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 231 (Tex. 1991).

Considering these factors in the context of this case, we first conclude Kelly's burden and inconvenience in defending against appellees' claims in the Texas litigation do not render jurisdiction over it in Texas unfair or unjust. This is particularly true in light of the undisputed fact that Kelly signed the Purchase Agreement and acquired the Notes with full knowledge of pending litigation in Texas concerning the noteholder's obligations to advance funds under the Notes. Second, the forum state's interest in resolving a dispute involving its own residents is neither unfair nor unjust, and thus further supports the reasonableness of concluding that Texas has jurisdiction over Kelly. Third, appellees have a significant interest in seeking convenient and effective relief in Texas in connection with their claims under the Notes, especially as their claims were the subject of pending litigation with the initial noteholder—Kelly's assignor—when Kelly acquired the Notes. This factor favors our concluding that jurisdiction over Kelly comports with traditional notions of fair play and substantial justice. Fourth, the interstate judicial system's interest in the most efficient resolution of controversies favors the forum's jurisdiction over Kelly. The obligations of the lenders under the Notes, which includes both Dynex and Kelly as assignee, are most efficiently resolved in a single forum. Further, requiring appellees to participate in litigation in another state concerning the same claims

they had asserted in litigation pending in the forum state would result in inefficiency, placing an unnecessary burden on the judicial system of two states. Last, the states' shared interest in furthering fundamental substantive social policies strongly supports the notion that the forum state's jurisdiction over Kelly is neither unfair nor unjust. To permit an out-of-state entity to acquire promissory notes that are the subject of known, pending litigation in a state court without subjecting itself to the exercise of specific jurisdiction of the forum state with respect to that litigation would invite parties to make such transfers as a shield to avoid the efficacy of the pending litigation. The fundamental substantive interest of state courts in discouraging such activity, in conjunction with the other factors considered above, supports the conclusion that the Texas court's exercise of specific jurisdiction over Kelly with respect to this case comports with traditional notions of fair play and substantial justice. *See Burger King*, 471 U.S. at 477, 105 S.Ct. 2174.

Accordingly, we conclude that the evidence supports the exercise of personal jurisdiction consistent with due process; conversely, Kelly has failed to negate all bases for personal jurisdiction. We affirm the trial court's order denying Kelly's special appearance.