**John DOE I and John Doe II, Appellants,**

v.

**Kenneth ROBERTS, Appellee.**

No. 05–05–00181–CV.

Court of Appeals of Texas, Dallas.

Aug. 7, 2006.

See also 109 S.W.3d 928.

Thomas B. Cowart, Turley Law Firm, Lori A. Watson, The Law office of Windle Turley, P.C., Dallas, for Appellant.

Hal M. Browne, Law Office of Hal Browne, Randal Mathis, Mathis and Donheiser, Dallas, for Appellee.

Before Justices MOSELEY, RICHTER, and LANG–MIERS.

## OPINION

Opinion by Justice MOSELEY.

In this interlocutory appeal, John Doe I and John Doe II appeal an order granting Kenneth Roberts's amended special appearance. *See* TEX. CIV. PRAC. & REM.CODE ANN. § 51.014(a)(7) (Vernon Supp.2006). For the reasons below, we conclude that Roberts's contacts with the State of Texas are sufficient to support general jurisdiction, and the exercise of jurisdiction over him by Texas courts is consistent with traditional notions of fair play and substantial justice. Accordingly, we conclude the trial court erred in granting Roberts's amended special appearance and dismissing the claims against him. We reverse the trial court's order and remand this case for further proceedings.

## I. FACTUAL AND PROCEDURAL BACKGROUND

John Doe I and John Doe II are residents of Missouri. They filed this lawsuit against the Roman Catholic Diocese of Dallas ("Diocese"), the Roman Catholic Archdiocese of St. Louis ("Archdiocese"), and Roberts, a Catholic priest, alleging Roberts sexually molested them numerous times between 1968 and 1977, while they were minors. All of the alleged sexual assaults occurred in Missouri. At the time of the alleged assaults, Roberts resided in St. Louis, Missouri. Although Roberts had been a priest in the Diocese, he had moved to St. Louis in 1968 to receive psychiatric treatment, and while there had asked the Archdiocese for a temporary grant of priestly faculties. The Archdiocese granted Roberts faculties in 1968, thus permitting him to serve as a priest. He continued working as a priest, living in Missouri and promoting two books he authored, including attending book promotions in Texas. He returned to Texas in January 1995, and retired from the Diocese in September 1995. He is now a resident of Ohio.

The Archdiocese filed a special appearance, which the trial court granted. That decision was affirmed on appeal. *See John Doe I & John Doe II v. Roman Catholic Archdiocese of St. Louis ex rel. Rigali,* 109 S.W.3d 928 (Tex.App.-Dallas 2003, no pet.). (That case is hereinafter referred to as the *St. Louis Archdiocese* case.)

Roberts filed a first amended special appearance asserting the trial court lacked personal jurisdiction over him because he had not established sufficient minimum contacts and subjecting him to such jurisdiction would be inconsistent with traditional notions of fair play and substantial justice. Roberts filed a "brief and evidentiary supplement" in support of his amend-

ed special appearance. John Doe I and John Doe II filed a response, supported by filed evidence. The trial court heard the amended special appearance and the response. Subsequently, the trial court signed an order granting Roberts's amended special appearance and dismissing the claims and causes of action against him. Although no findings of fact and conclusions of law were filed, the order states expressly that the trial court determined "that the assertion of jurisdiction over [Roberts] would not be consistent with traditional notions of fair play and substantial justice." This accelerated appeal timely followed. *See* TEX.R.APP. P. 26.1(b).

## II. BURDEN OF PROOF AND STANDARD OF REVIEW

■ The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002). A nonresident defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases. *Id.* On appeal, we determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony. TEX.R. CIV. P. 120a(3); *De Prins v. Van Damme,* 953 S.W.2d 7, 18–19 (Tex.App.-Tyler 1997, writ denied).

■ Whether a trial court has personal jurisdiction over a defendant is a question of law. *Marchand,* 83 S.W.3d at 794. In resolving this question of law, however, a trial court must frequently resolve questions of fact. *Id.* We review the trial court's factual findings for legal and factual sufficiency and review the trial court's legal conclusions de novo. *Id.* When, as

here, there are no findings of fact and conclusions of law, the trial court's order implies all facts found in the evidence necessary to support the order. *Id.* at 795.

## III. APPLICABLE LAW

■ The Texas long-arm statute governs Texas courts' exercise of jurisdiction over a nonresident defendant. *See* TEX. CIV. PRAC. & REM.CODE ANN. §§ 17.041–.045 (Vernon 1997 & Supp.2006); *Marchand,* 83 S.W.3d at 795. That statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas, and the statute lists some activities that constitute "doing business." TEX. CIV. PRAC. & REM.CODE ANN. § 17.042 (Vernon 1997). The list of activities, however, is not exclusive. Section 17.042's broad language extends Texas courts' personal jurisdiction "'as far as the federal constitutional requirements of due process will permit.'" *Marchand,* 83 S.W.3d at 795 (quoting *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex.1977)).

■ Personal jurisdiction over a nonresident defendant meets the constitutional due process requirements when two conditions are met: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdiction. *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

■ The "touchstone" of jurisdictional due process analysis is "purposeful

availment." *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex.2005). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Michiana Easy Livin' Country, Inc.,* 168 S.W.3d at 784. In *Michiana Easy Livin' Country, Inc.,* the Texas Supreme Court discussed the requirements of "purposeful availment," outlining three important aspects to be considered. "First, it is only the defendant's contacts with the forum that count: purposeful availment 'ensures that a defendant will not be haled into a jurisdiction solely as a result of . . . the unilateral activity of another party or a third person.' " *Id.* at 785 (quoting *Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. 2174). Second, the acts relied upon must be "purposeful" rather than "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Magazine, Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Third, a defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. By invoking the benefit and protections of a forum's laws, a nonresident consents to suit there. *Id.* (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). By contrast, a nonresident may purposefully avoid a jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction. *Id.* (citing *Burger King Corp.,* 471 U.S. at 473, 105 S.Ct. 2174). It is the quality and nature of the contacts, not their number, that is determinative. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 809–10 (Tex.2002).

 Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *Marchand,* 83 S.W.3d at 795 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Id.* at 796 (citing *Guardian Royal Exch. Assur., Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 228 (Tex.1991)). The minimum contacts analysis for specific jurisdiction focuses on the relationship among the defendant, the forum, and the litigation. *Helicopteros Nacionales de Colombia, S.A.,* 466 U.S. at 414, 104 S.Ct. 1868; *Michiana Easy Livin' Country, Inc.,* 168 S.W.3d at 790. In contrast, general jurisdiction is present when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Marchand,* 83 S.W.3d at 796 (citing *Guardian Royal Exch. Assur., Ltd.,* 815 S.W.2d at 228; *Schlobohm v. Schapiro,* 784 S.W.2d 355, 357 (Tex.1990)). When general jurisdiction is asserted, the minimum contacts analysis is more demanding and requires a showing of substantial activities in the forum state. *Guardian Royal Exch. Assur., Ltd.,* 815 S.W.2d at 228.

 In addition to minimum contacts, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *Marchand,* 83 S.W.3d at 795 (citing *Int'l Shoe,* 326 U.S. at 316, 66 S.Ct. 154). We evaluate the defendant's contacts in light of the following factors in making that determination: (1) the burden on the nonresident defendant; (2) the forum state's interest in

adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Burger King Corp.,* 471 U.S. at 477, 105 S.Ct. 2174; *World–Wide Volkswagen Corp.,* 444 U.S. at 292, 100 S.Ct. 559; *Guardian Royal Exch. Assur., Ltd.,* 815 S.W.2d at 231. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exch. Assur., Ltd.,* 815 S.W.2d at 231.

## IV. DISCUSSION

■ John Doe I and John Doe II alleged that Roberts was an employee of the Diocese. Thus, they met their burden of pleading allegations sufficient to bring Roberts within the provisions of the Texas long-arm statute. *See BMC Software Belgium, N.V.,* 83 S.W.3d at 793. We now address whether Roberts succeeded in negating all bases of personal jurisdiction.

### A. Minimum Contacts

■ In their second issue, John Doe I and John Doe II contend the evidence demonstrates that Roberts had continuous and systematic contacts with Texas sufficient to support general jurisdiction, and, therefore, the trial court erred in concluding to the contrary and in granting Roberts's amended special appearance.

The evidence shows that Roberts wrote to the bishop of the Diocese in 1960 applying to be considered "as a candidate for the priesthood" in the Diocese.[1] According to Roberts, the bishop of the Diocese

sponsored him in the seminary in Rome from 1960 to 1966, and the Diocese paid his tuition.

In 1966, Roberts was ordained and incardinated into the Diocese. Evidence in the record explains that "incardination" refers to the requirement that "[e]very cleric without exception must be subject to a definite ecclesiastical superior." As Roberts described it, "Every priest has to have a bishop." The Diocese helped Roberts obtain a United States visa. From 1966 to 1968, Roberts was assigned to parishes in the Diocese. Following reports of sexual misconduct, in 1968, Roberts went to a hospital in St. Louis for psychiatric treatment, for which the Diocese paid. In August 1968, Roberts asked for and received permission from the bishop of the Diocese to live and work in St. Louis. Roberts received "faculties" from the Archdiocese, which allowed him to live in St. Louis. According to Roberts, he could not have received faculties from any other diocese without being incardinated into a diocese. In the record there are letters from 1968 through 1973, from Roberts to officials of the Diocese, each requesting a year's leave of absence. In the early 1970s, Roberts wrote two books and promoted them in Houston, Galveston, and San Antonio; broadcast a television show from San Antonio for the Catholic Hour and from Victoria, Texas; and conducted retreats in Texas and a mission in Houston. In the 1980s, Roberts was involved in broadcasting television shows regarding his books and religious issues.

In 1989, the archbishop suggested that Roberts contact the bishop of the Diocese regarding a reappraisal of Roberts's work "in the communication field" and his relationship with the Diocese. In response, Roberts wrote the bishop of the Diocese to thank him for allowing Roberts to "follow

1. The Diocese of Dallas was then the Diocese of Dallas–Fort Worth.

this special Apostolate in the past" and assure him of Roberts's "continued allegiance and ob[e]dience in the future." Roberts offered to discuss the matter with the bishop by mail, phone call, or a visit to Dallas. The bishop wrote the archbishop of the Archdiocese that Roberts was a priest in good standing and approved of Roberts "contin[ing] to do his work as he has been doing in the past with his residence in [the Archdiocese]."

In 1994, Roberts communicated with the Diocese about an allegation of sexual misconduct in St. Louis. Also in 1994, the Diocese paid for Roberts's hospital treatment. In January 1995, Roberts returned to Texas, and the Diocese assigned him to work in a diocesan parish under certain restrictions and supervision. In September 1995, Roberts retired under certain restrictions placed on him by the Diocese. He received a pension from the Diocese beginning in 1995. In 1999, the Diocese suspended Roberts and paid for psychiatric counseling.

Roberts argues that from 1967 to 1994, his relationship with the Diocese consisted of "courtesy correspondence," and he did not work in Dallas. However, the record shows that the Diocese's bishop was Roberts's "ecclesiastical superior" pursuant to incardination, whose permission was required for Roberts to live in St. Louis and conduct his ministry. Even if the record reflects gaps in communications between Roberts and the Diocese, Roberts received health care during his incardination and a pension on his retirement, showing continuous and systematic contacts with Texas. *See Nikolai v. Strate*, 922 S.W.2d 229, 232, 239 (Tex.App.-Fort Worth 1996, writ denied) (concluding Texas court had general jurisdiction over Colorado attorney in legal malpractice suit by Texas resident concerning Colorado attorney's handling of previous Colorado lawsuit). Moreover,

Roberts's physical presence in the State of Texas is not required, so long as his efforts are "purposefully directed" toward residents of the State. *See Burger King Corp.*, 471 U.S. at 476, 105 S.Ct. 2174 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there."). Because this evidence of continuous and systematic contacts with the State of Texas is sufficient for the trial court to exercise general jurisdiction over Roberts, we conclude the trial court erred in impliedly concluding to the contrary. We resolve John Doe I and John Doe II's second issue in their favor.

**B. Traditional Notions of Fair Play and Substantial Justice**

In their fourth issue, John Doe I and John Doe II contend that Roberts failed to meet his burden of presenting a "compelling case" that the exercise of jurisdiction over him would not be consistent with fair play and substantial justice.

John Doe I and John Doe II argue, relying on *Siemens AG v. Houston Casualty Co.*, 127 S.W.3d 436, 441–42 (Tex. App.-Dallas 2004, pet. dism'd), that Roberts failed to introduce any evidence relating to the five factors outlined in *Burger King, Corp.*, 471 U.S. at 477–78, 105 S.Ct. 2174. In *Siemens AG*, 127 S.W.3d at 441, the parties challenging personal jurisdiction submitted affidavits supporting their special appearance, then withdrew the affidavits, and did not present any other evidence "in support of their special appearance to establish their lack of contacts with Texas." Here, however, Roberts submitted evidence as to his contacts and relied in part on that evidence to support his argument. Accordingly, we reject John Doe I and John Doe II's argument that,

like the parties in *Siemens AG*, Roberts presented no evidence on which to base an analysis of the *Burger King Corp.* factors.

In support of his contention that the exercise of jurisdiction over him by a Texas court would not be consistent with the notions of fair play and substantial justice, Roberts argues that the analysis of the Archdiocese's special appearance in the *St. Louis Archdiocese* decision applies to the facts underlying his special appearance and leads to the same legal conclusion— that Texas cannot assert personal jurisdiction over Roberts. We reject this argument. First, we reject Roberts's arguments that the facts here are the same as in that case and that the trial court in this case "had before it an identical record to that before this Court in *John Doe I*" because nothing in the record supports those assertions. More importantly, however, the minimum contacts and due process concerns discussed in the *St. Louis Archdiocese* case relate to the Archdiocese—a Missouri organization—and not to Roberts—an individual residing in Missouri. Thus, any decision relating to the court's personal jurisdiction over the Archdiocese is not determinative as to Roberts.

■ We now evaluate Robert's contacts in light of the factors set forth in *Burger King Corp* to determine whether the exercise of personal jurisdiction over him comports with traditional notions of fair play and substantial justice. *See Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. 2174.

### 1. Burden on the Defendant

In his brief supplementing his special appearance, Roberts argued that he was "living on a pension and social security and without significant personal means." He argued that trial in Dallas would "amount to thousands of dollars," but the burden of a trial in St. Louis would be "significantly less." Roberts argued that, instead of expenses for airfare, local travel, and hotel and meal expenses for preparation and trial in Dallas, trial in the St. Louis area would be a half-day car trip and he could stay with friends. In his deposition, Roberts referred to the facts that he received a pension and social security.

In the trial court and on appeal, Roberts relies on this Court's decision in the *St. Louis Archdiocese* case that the Archdiocese, a resident of Missouri, "would incur substantial travel and litigation costs defending itself in Texas." *St. Louis Archdiocese*, 109 S.W.3d at 931. However, the issue here is not whether it is more burdensome for Roberts to litigate in Texas or in Missouri; nothing in the record shows that Missouri has jurisdiction over Roberts, a resident of Ohio. As between Texas or Ohio, nothing in the record relates to the burden of litigating the claims in Texas. And even though there is a significant geographical distance between Texas and Ohio, distance alone is not sufficient to defeat jurisdiction. *See Guardian Royal Exch. Assur., Ltd.*, 815 S.W.2d at 231. Moreover, the record shows Roberts traveled to Texas to promote his books and offered to travel to Texas to discuss his work and relationship with the Diocese.

### 2. Interest of the Forum State in Adjudicating this Dispute

Roberts argued that "Texas has no compelling interest in adjudicating this dispute." However, John Doe I and John Doe II alleged in their third amended petition that the Diocese, a Texas resident, was liable for Roberts's sexual abuse of them under a theory of vicarious liability, among other theories, because Roberts "engaged in this wrongful conduct while in the course and scope of his employment and while incardinated to the Dallas Diocese." Accordingly, we conclude Texas

has more substantial interest than Ohio in adjudicating the claims.

### 3. Plaintiffs' Interest in Obtaining Convenient and Effective Relief

Although Roberts argued that John Doe I and John Doe II's "interest in obtaining convenient and effective relief would be better served if this dispute were resolved by a Missouri court," nothing in the record shows he is subject to jurisdiction in Missouri, that state's courts would assume jurisdiction over him, or suit could be brought there, in light of his residence in Ohio. Moreover, John Doe I and John Doe II's interest in obtaining convenient and effective relief would be impaired by litigating against an employer in Texas—the Diocese—but an employee in Ohio.

### 4. Interstate Judicial System's Interest in Obtaining Most Efficient Resolution of Controversies

Citing the *St. Louis Archdiocese* case, Roberts argued that because most parties reside in Missouri, most witnesses were likely to reside there, and the alleged torts occurred there, Texas had no greater claim than Missouri in promoting efficient resolution of this case. However, because Roberts is a resident of Ohio, requiring John Doe I and John Doe II to participate in litigation in Texas, Ohio, and Missouri concerning the same claims they had asserted in Texas would result in inefficiency, placing an unnecessary burden on the judicial systems of these states. *See Kelly Inv., Inc. v. Basic Capital Mgmt., Inc.*, 85 S.W.3d 371, 376–77 (Tex.App.-Dallas 2002, no pet.).

### 5. Shared Interest of Several States in Furthering Fundamental Substantive Social Policies

Quoting from *St. Louis Archdiocese*, 109 S.W.3d at 931, Roberts argued that although "each state potentially involved in these claims certainly has some interest in their resolution, we cannot agree with [John Doe I and John Doe II] that Texas's interest outweighs that of Missouri, given that the alleged torts occurred in Missouri, involved Missouri residents, and would be adjudicated under Missouri law." However, these alleged torts involve an Ohio resident, and as between Texas and Ohio, we cannot conclude that Ohio's interest in litigating these sexual abuse claims exceeds Texas's interest.

### 6. Conclusion

After considering the record and arguments in light of the *Burger King Corp.* factors, we conclude the exercise of jurisdiction over Roberts does not offend traditional notions of fair play and substantial justice. Accordingly, the trial court erred in concluding to the contrary, and we resolve John Doe I and John Doe II's fourth issue in their favor.

## V. CONCLUSION

Having resolved John Doe I and John Doe II's second and fourth issues in their favor, we reverse the trial court's order granting Roberts's first amended special appearance and remand this case to the trial court for further proceedings. We need not address the remaining two issues that challenge specific jurisdiction and jurisdiction pursuant to a contractual relationship.