**SOUTHERN STUCCO, INC., Appellant,**

v.

**CG MULTIFAMILY–NEW ORLEANS, L.P., Appellee.**

No. 05–05–00977–CV.

Court of Appeals of Texas, Dallas.

Aug. 14, 2006.

Joseph Edward Byrne, Byrne, Townsend, Mead & Smitherman, Margaret R. Mead, Byrene, Mead & Smitherman, Dallas, for Appellant.

Jeffery O. Marshall, Elser, Moskowitz, Edleman & Dicker, LLP, LLP, Dale E. Butler, Winstead Sechrest & Minick PC, and Michelle Rieger, Winstead McGuire Sechrest & Minick, R. Douglas Rees, Cooper & Scully, P.C., Laurie Jayne Elza, Hollye C. Fisk, Fisk & Fiedler, P.C., Paul A. Bezney, Adkerson, Hauder & Bezney, P.C., Dallas, Timothy M. McDaniel, McDaniel & Allen, Houston, Frank W. Lagarde, Jr., Metairie, LA, for Appellee.

Before Justices MOSELEY, BRIDGES, and LANG–MIERS.

## OPINION

Opinion By Justice MOSELEY.

In three issues in this interlocutory appeal, Southern Stucco, Inc., contends the trial court erred in denying its special appearance challenging the trial court's specific and general jurisdiction. *See* Tex. Civ. Prac. & Rem.Code Ann. § 51.014(a)(7) (Vernon Supp.2006). For the reasons below, we conclude the trial court did not err in denying Southern's special appearance, and we affirm the trial court's order.

## I. FACTUAL AND PROCEDURAL BACKGROUND

CG Multifamily–New Orleans, L.P., contracted with Greystar Development and Construction, L.P., to build an apartment complex on property CG Multifamily owned in New Orleans, Louisiana. Greystar is a Delaware limited partnership doing business in Texas, and its principal place of business is Houston. Greystar contracted with various subcontractors, including Southern, which is a Louisiana corporation with its principal place of business in Baton Rouge, Louisiana.

In April 2001, problems arose with the construction including cracking in the stucco. Subsequently, CG Multifamily sued Greystar, Southern, and other parties alleging, among other defects, that water had "infiltrated through the exterior stucco" and caused property damage. CG Multifamily alleged a cause of action for negligence against Southern. CG Multifamily alleged that nonresident defendants were subject to the court's jurisdiction because they "maintained sufficient contacts

with Greystar in Texas throughout the construction process at issue in this suit."

Southern filed a special appearance asserting that the trial court did not have jurisdiction over it. Southern supported its special appearance with the affidavit of its president and sole stockholder, Wayne Noble. CG Multifamily responded and supported its response with Noble's deposition and exhibits.

An associate judge heard the special appearance and denied it. Southern appealed that decision to the district court, which heard the special appearance de novo, affirmed the associate judge's ruling, and denied the special appearance. This accelerated appeal timely followed. *See* Tex.R.App. P. 26.1(b).

## II. BURDEN OF PROOF AND STANDARD OF REVIEW

■ The plaintiff bears the initial burden of pleading sufficient allegations to bring a nonresident defendant within the provisions of the Texas long-arm statute. *BMC Software Belg., N.V. v. Marchand,* 83 S.W.3d 789, 793 (Tex.2002). A nonresident defendant challenging a Texas court's personal jurisdiction over it must negate all jurisdictional bases. *Id.* On appeal, we determine the special appearance on the basis of the pleadings, any stipulations made by and between the parties, such affidavits and attachments as may be filed by the parties, the results of discovery processes, and any oral testimony. Tex.R. Civ. P. 120a(3); *De Prins v. Van Damme,* 953 S.W.2d 7, 18–19 (Tex.App.-Tyler 1997, writ denied).

■ Whether a trial court has personal jurisdiction over a defendant is a question of law. *Marchand,* 83 S.W.3d at 794. In resolving this question of law, however, a trial court must frequently resolve questions of fact. *Id.* We review the trial court's factual findings for legal and factu-al sufficiency and review the trial court's legal conclusions de novo. *Id.* When, as here, there are no findings of fact and conclusions of law, the trial court's order implies all facts found in the evidence necessary to support the order. *Id.* at 795.

## III. APPLICABLE LAW

■ The Texas long-arm statute governs Texas courts' exercise of jurisdiction over a nonresident defendant. *See* Tex. Civ. Prac. & Rem.Code Ann. §§ 17.041–.045 (Vernon 1997 & Supp.2006); *Marchand,* 83 S.W.3d at 795. That statute permits Texas courts to exercise jurisdiction over a nonresident defendant that "does business" in Texas. Tex. Civ. Prac. & Rem.Code Ann. § 17.042 (Vernon 1997). One of the acts constituting business in Texas is when a nonresident "contracts by mail or otherwise with a Texas resident and either party is to perform the contract in whole or in part" in Texas. *Id.* § 17.042(1). Section 17.042's broad language extends Texas courts' personal jurisdiction " 'as far as the federal constitutional requirements of due process will permit.' " *Marchand,* 83 S.W.3d at 795 (quoting *U–Anchor Adver., Inc. v. Burt,* 553 S.W.2d 760, 762 (Tex. 1977)).

■ Personal jurisdiction over a nonresident defendant meets the constitutional due process requirements when two conditions are met: (1) the defendant has established minimum contacts with the forum state; and (2) the exercise of jurisdiction comports with traditional notions of fair play and substantial justice. *Id.* (citing *Int'l Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945)). A nonresident defendant that has "purposefully availed" itself of the privileges and benefits of conducting business in the foreign jurisdiction has sufficient contacts with the forum to confer personal jurisdic-

tion. *Id.* (citing *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 474–76, 105 S.Ct. 2174, 85 L.Ed.2d 528 (1985)).

▮ The "touchstone" of jurisdictional due process analysis is "purposeful availment." *Michiana Easy Livin' Country, Inc. v. Holten,* 168 S.W.3d 777, 784 (Tex. 2005). "[I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws." *Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958); *Michiana Easy Livin' Country, Inc.,* 168 S.W.3d at 784. In *Michiana Easy Livin' Country, Inc.,* the Texas Supreme Court discussed the requirements of purposeful availment, outlining three important aspects to be considered. "First, it is only the defendant's contacts with the forum that count: purposeful availment 'ensures that a defendant will not be haled into a jurisdiction solely as a result of ... the unilateral activity of another party or a third person.'" *Id.* at 785 (quoting *Burger King Corp.,* 471 U.S. at 475, 105 S.Ct. 2174). Second, the acts relied upon must be "purposeful" rather than "random, isolated, or fortuitous." *Id.* (quoting *Keeton v. Hustler Magazine Inc.,* 465 U.S. 770, 774, 104 S.Ct. 1473, 79 L.Ed.2d 790 (1984)). Third, a defendant must seek some benefit, advantage, or profit by "availing" itself of the jurisdiction. By invoking the benefit and protections of a forum's laws, a nonresident consents to suit there. *Id.* (citing *World–Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980)). By contrast, a nonresident may purposefully avoid a jurisdiction by structuring its transactions so as neither to profit from the forum's laws nor be subject to its jurisdiction. *Id.* (citing *Burger King Corp.,* 471 U.S. at 473, 105 S.Ct. 2174). It

is the quality and nature of the contacts, not their number, that is determinative. *Am. Type Culture Collection, Inc. v. Coleman,* 83 S.W.3d 801, 809–10 (Tex.2002). "When a contract with a resident is involved, in evaluating whether the defendant established minimum contacts with the forum state, we are to focus on 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing.'" *Kelly Inv., Inc. v. Basic Capital Mgmt., Inc.,* 85 S.W.3d 371, 374 (Tex. App.-Dallas 2002, no pet.) (quoting *Burger King Corp.,* 471 U.S. at 479, 105 S.Ct. 2174).

▮ Personal jurisdiction exists if the nonresident defendant's minimum contacts give rise to either specific jurisdiction or general jurisdiction. *Marchand,* 83 S.W.3d at 795 (citing *Helicopteros Nacionales de Colom., S.A. v. Hall,* 466 U.S. 408, 413–14, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984)). Specific jurisdiction is established if the defendant's alleged liability arises from or is related to an activity conducted within the forum. *Id.* at 796 (citing *Guardian Royal Exch. Assurance, Ltd. v. English China Clays, P.L.C.,* 815 S.W.2d 223, 228 (Tex.1991)). The minimum contacts analysis for specific jurisdiction focuses on the relationship among the defendant, the forum, and the litigation. *Helicopteros Nacionales de Colom., S.A.,* 466 U.S. at 414, 104 S.Ct. 1868; *Michiana Easy Livin' Country, Inc.,* 168 S.W.3d at 790. In contrast, general jurisdiction is present when a defendant's contacts in a forum are continuous and systematic so that the forum may exercise personal jurisdiction over the defendant even if the cause of action did not arise from or relate to activities conducted within the forum state. *Marchand,* 83 S.W.3d at 796 (citing *Guardian Royal Exch. Assurance, Ltd.,* 815 S.W.2d at 228; *Schlobohm v. Schapi-*

*ro*, 784 S.W.2d 355, 357 (Tex.1990)). When general jurisdiction is asserted, the minimum contacts analysis is more demanding and requires a showing of substantial activities in the forum state. *Guardian Royal Exch. Assurance, Ltd.*, 815 S.W.2d at 228.

In addition to minimum contacts, the exercise of personal jurisdiction must comport with traditional notions of fair play and substantial justice. *Marchand*, 83 S.W.3d at 795 (citing *Int'l Shoe*, 326 U.S. at 316, 66 S.Ct. 154). We evaluate the defendant's contacts in light of the following factors in making that determination: (1) the burden on the nonresident defendant; (2) the forum state's interest in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and (5) the shared interest of the several states in furthering substantive social policies. *Burger King Corp.*, 471 U.S. at 477, 105 S.Ct. 2174; *World–Wide Volkswagen Corp.*, 444 U.S. at 292, 100 S.Ct. 559; *Guardian Royal Exch. Assur., Ltd.*, 815 S.W.2d at 231. "Only in rare cases, however, will the exercise of jurisdiction not comport with fair play and substantial justice when the nonresident defendant has purposefully established minimum contacts with the forum state." *Guardian Royal Exchange Assur., Ltd.*, 815 S.W.2d at 231.

## IV. DISCUSSION

In its first issue, Southern contends the trial court erred in denying its special appearance challenging specific jurisdiction because the litigation does not arise out of Southern's contacts with Texas.

The record shows that Southern entered into a contract with Greystar, and the contract showed Greystar's address was Houston and that both CG Multifamily and the project architect were located in Texas. Southern returned the signed subcontract to Greystar's offices in Houston. The subcontract required Southern to perform a portion of the subcontract in Texas because it required Southern to submit pay applications to Greystar at its Houston office. Specifically, the subcontract states that "[p]rogress payments ... shall be made based on application for payments submitted to [Greystar]...." The record shows that Southern faxed a pay application each month to Greystar in Houston, Greystar prepared a check in Houston and faxed a copy to Southern, which then faxed a lien release to Greystar in Houston; upon receipt of the faxed lien release, Greystar mailed a check drawn on a Texas bank from Houston to Southern; Southern then mailed the original lien release to Greystar in Houston. Southern received thirty-three payments between September 2000 and April 2002, totaling $1,285,942.44. Greystar also paid Southern a retainage, and Southern signed a final release of lien, which were handled in the same way as the monthly payments.

The record also shows that Southern sent change orders and invoices for the construction to Greystar in Houston. There was also evidence that Southern received architecture drawings from Greystar. Noble acknowledged that "there was a regular pattern of communication between Southern Stucco's offices and Greystar's offices in Houston." Noble also stated that Southern had several telephone conversations with the manufacturer of the stucco, MagnaWall, which was a Texas corporation located in San Antonio, before the construction began; Southern also telephoned MagnaWall when crack problems began in April 2001. Noble also participated by conference call in a meeting at Greystar's Houston office in April 2001 regarding the construction problems.

At the completion of Southern's work on the project, Southern issued a warranty on the construction project, agreeing "to repair and replace any or all of this work, ..., that may prove to be defective in its workmanship or material or fails to conform to the requirements of the Contract Documents...." The warranty also provided that Southern would "honor and pay the costs and charges thereof upon demand" if Southern failed to comply with the warranty's repair or replacement within ten days after written notification by CG Multifamily or Greystar. Greystar hired Southern to perform repair work on the project several times, including March 2004, after Southern finished the project. Noble testified that the invoice for the repairs would have been sent to Greystar, and payment would have been received from Greystar.

The record shows that Southern contracted with Greystar, a Texas resident; submitted pay applications to Greystar; sent invoices to Greystar and received payment from Greystar; participated in meetings and discussions with Greystar about the construction project and the stucco work by fax, mail, and telephone; and issued a warranty to Greystar. We conclude this evidence shows Southern purposefully availed itself of the privilege of conducting activities within Texas: Southern's own contacts with Texas were purposeful, not random, isolated or fortuitous, and Southern sought a benefit, advantage, or profit by availing itself of the jurisdiction. *See Silbaugh v. Ramirez,* 126 S.W.3d 88, 95–96 (Tex.App.-Houston [1st Dist.] 2002, no pet.) (concluding contacts sufficient to support specific jurisdiction when nonresident partially performed contract in Texas by making conference calls to Texas, faxing and mailing letters regarding the contract to Texas resident, and receiving money wired from Texas to nonresident's out-of-state account).

In reaching this conclusion, we necessarily reject Southern's reliance on *Holt Oil & Gas Corp. v. Harvey,* 801 F.2d 773, 778 (5th Cir.1986). In that case, a Texas company entered into a joint operating agreement with an Oklahoma resident to develop an Oklahoma oil and gas project. After the Texas resident filed suit in federal court in Texas, the Oklahoma resident contested personal jurisdiction. The Fifth Circuit relied on the following facts to conclude the exercise of specific jurisdiction was not proper: the choice-of-law provision in the agreement specified Oklahoma would govern the agreement; performance of the contract was centered in Oklahoma; the Oklahoma resident mailed payments to Texas; the exchange of communications between Texas and Oklahoma in carrying out the contract "rested on nothing but 'the mere fortuity that [Holt] happens to be resident of the forum.'" *Id.* (quoting *Patterson v. Dietze, Inc.,* 764 F.2d 1145, 1145 (5th Cir.1985)). Here, however, there is no choice-of-law provision, as Southern acknowledges. In addition, Southern's contacts with Texas as detailed above, particularly the pay application procedure, distinguish Southern's "purposeful availment" from the Oklahoma resident's failure to purposefully avail himself of the benefits and protections of Texas law in *Holt Oil & Gas Corp. See id.*

We also reject Southern's arguments that minimum contacts were not established because the subcontract required no performance in Texas and the payment application procedure was not contained in the contract and was "merely incidental" to Southern's performance in Louisiana. *See Kelly Inv., Inc.,* 85 S.W.3d at 374 (analysis of minimum contacts includes "terms of the contract and the parties' actual course of dealing").

Accordingly, we conclude the trial court did not err in impliedly concluding that

577

Southern purposefully established sufficient minimum contacts with Texas to support specific jurisdiction.

Moreover, we cannot conclude that the exercise of jurisdiction does not comport with fair play and substantial justice under these facts, and Southern does not argue that this requirement is unmet here. *See Burger King Corp.*, 471 U.S. at 476–78, 105 S.Ct. 2174 (outlining considerations that would render jurisdiction unreasonable or unfair). Therefore, we conclude the trial court did not err in denying Southern's special appearance challenging specific jurisdiction. We resolve Southern's first issue against it.

## V. CONCLUSION

Because of our disposition of Southern's first issue, we affirm the trial court's order denying Southern's special appearance. We need not consider Southern's remaining two issues, in which it contends the trial court erred in denying Southern's special appearance challenging general jurisdiction.